Christa K. CHRISTENSEN, Appellee,

v.

SNAP–ON TOOLS CORPORATION,
Appellant.

No. 95–88.

Supreme Court of Iowa.

Sept. 18, 1996.

Paul C. Thune and Michael S. Roling of Peddicord, Wharton, Thune & Spencer, P.C., Des Moines, for appellant.

Mark S. Soldat, Algona, for appellee.

## PER CURIAM.

This case comes to us on review of a district court proceeding reversing in part and affirming in part a decision of the industrial commissioner in a workers' compensation case. Snap–On Tools Corporation, the employer, has appealed, and Christa K. Christensen, the employee, has cross-appealed. We affirm in part, reverse in part, and remand for further proceedings.

### I. Background Facts and Proceedings

Appellee, Christa Christensen, began working for Snap–On Tools Corporation, the appellant, on June 19, 1989. She was employed as a "strip tank operator." Her responsibilities consisted of placing metal parts in a basket, lowering the basket into a tank of hot caustic liquid where any paint would be stripped off, removing the parts from the basket, and then cleaning the parts with a pressure washer.

Shortly after beginning this job, Christensen began complaining of pain in her right arm. On August 14, 1989, she visited Dr. Moss for a hard lump on the top of her right elbow and pain extending from her elbow to her wrist. She was diagnosed with lateral epicondylitis and prescribed aspirin and a wrist splint. She was allowed to continue with her regular duties at work.

On November 16, 1989, Christensen's arm was injured when it was caught between the rinse tank and a hoist. On December 9, 1989, she returned to Dr. Moss for treatment of the resulting pain and swelling. The doctor then advised her to perform only left-handed work for one week. She has contin-

ued to experience pain in the arm and has seen numerous physicians for treatment. On October 15, 1990, Christensen was placed on lay-off status due to reduced production needs at Snap–On. In February of 1992, Christensen went to work for a different manufacturer doing assembly work.

Christensen later filed a claim for workers' compensation benefits. On June 18, 1993, a hearing was held before a deputy industrial commissioner. The deputy commissioner filed a decision finding Christensen suffered a ten percent impairment to her right arm, refusing to award penalty benefits for unpaid permanent partial disability, and awarding Christensen interest and costs. This decision, with slight modification, was affirmed by the industrial commissioner. Christensen then sought judicial review in the district court upon which the court reversed and remanded to the agency with respect to the impairment rating and penalty benefits, and reapportioned the assessment of costs. On appeal, Snap–On claims district court error in overturning the industrial commissioner's determination that Christensen's total impairment is ten percent to the right arm and in remanding to determine possible penalty benefits. On cross-appeal, Christensen claims district court error on issues of delayed payments, interest and penalty assessments, failing to specify compensation due and credit dates, and assessment of costs.

## II. Scope of Review

■ A district court decision rendered in an appellate capacity is examined for correction of errors at law. *Houlihan v. Employment Appeal Bd.*, 545 N.W.2d 863, 865 (Iowa 1996). In making such a determination, we apply the standards of Iowa Code section 17A.19(8) (1989), which provides an agency decision may be reversed where substantial rights of a party have been prejudiced and the action is unsupported by substantial evidence or affected by errors of law, to determine if our conclusion would be the same as that of the district court. If so, we must affirm; if not, reversal is appropriate. *Houlihan*, 545 N.W.2d at 865.

■ Factual findings of the industrial commissioner are binding on this court and are to be considered conclusive in cases where relevant evidence is in dispute and reasonable minds could differ as to the inferences fairly to be drawn therefrom. *Second Injury Fund v. Shank*, 516 N.W.2d 808, 812 (Iowa 1994).

## III. Impairment Rating

■ Christensen alleges the deputy commissioner's decision declining to find a greater degree of impairment was unsupported by substantial evidence in the record. She bases this argument partly on her presentation of lay witnesses who testified in their opinion she was injured to a much greater degree than what the physicians had diagnosed. Christensen is correct in her argument the commissioner is bound to consider this additional testimony. *See Terwilliger v. Snap–On Tools Corp.*, 529 N.W.2d 267, 273 (Iowa 1995); *Miller v. Lauridsen Foods, Inc.*, 525 N.W.2d 417, 421 (Iowa 1994).

On appeal by Christensen to the industrial commissioner, it was determined that claimant's injury included both the crush injury to the right forearm as well as right lateral epicondylitis. As such, the commissioner held that Christensen's entitlement to medical benefits extends to both conditions. The district court agreed and noted the commissioner failed to make any specific findings with respect to loss of function of claimant's right elbow. For this reason, remand was ordered so the commissioner may either reassess the functional capacity, considering both injuries, or clarify the ruling. We affirm the district court on this issue and remand to the commissioner.

■ In considering the compensation due to these injuries, the commissioner on remand, must consider all evidence, both medical and nonmedical. Lay witness testimony is both relevant and material upon the cause and extent of injury. *Miller*, 525 N.W.2d at 421. In this regard the deputy commissioner stated

Claimant's testimony and the lay testimony presented to show that claimant's loss of use of her right arm exceeds the assessment made by Dr. DeBartolo and Dr. Donovan is rejected and the physicians' rating

is accepted as more consistent with the documentary evidence presented.

The district court found the functional capacity evaluation used by the medical experts was limited in terms of factors it could not or did not attempt to measure such as endurance. The court noted lay testimony as to Christensen's level of impairment on a continuous basis, during non-work hours, and while doing non-employment-related activities. Whether these matters were factored into the deputy commissioner's decision is disputed and, at best, is unclear. In any event, on remand, they must be considered.

In *Terwilliger,* decided after the decisions of the commissioner and the district court, we discussed the requirement of considering both medical and nonmedical testimony. *Terwilliger,* 529 N.W.2d at 273. We reiterate the importance of these considerations and direct the commissioner on remand to craft the resulting decision accordingly.

IV. Penalty Benefits

An employee is entitled to penalty benefits under certain circumstances:

> If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the industrial commissioner shall award benefits in addition to those benefits payable under this chapter or chapter 85, 85A, or 85B, up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

Iowa Code § 86.13 (1991). Here, the parties dispute the correctness of the commissioner's decision to refuse an award of penalty benefits with respect to Snap–On's failure to timely commence payment of permanent partial disability (PPD) compensation and failure to pay the full amount of PPD benefits. A short review of the factual and procedural history relating to this issue is helpful.

A. Factual and procedural background

As already noted, Christensen injured her arm on November 16, 1989. No one questioned the occurrence of the injury. Christensen saw four doctors, none of whom stated that her injury was permanent; one doctor, however, did put restrictions on the use of her arm, with the "hope" the restric-

tions would not be permanent. Christensen missed a few days work in November and December 1989, but returned to work on December 10, 1989. Snap–On paid some healing period benefits in 1990 at a rate less than that to which it ultimately stipulated at the hearing in 1993.

In May 1991, Christensen retained an attorney who immediately obtained an independent medical examination. The doctor performing the medical examination, Dr. DeBartolo, concluded Christensen had a permanent injury resulting in a ten percent impairment of her arm. This rating was sent to Snap–On on November 12, 1991, together with a request that PPD payments be made. On December 19, 1991, Snap–On requested its own independent medical examination. The doctor performing the second examination, Dr. Donovan, also found a permanent injury resulting in a ten percent permanent impairment. Snap–On received Dr. Donovan's report on January 17, 1992.

Thirteen days later, on January 30, 1992, Snap–On wrote to Christensen's attorney stating it would pay PPD benefits based on a ten percent impairment at a rate of $286.32. At the hearing, Snap–On's witness testified the thirteen-day delay between receipt of Dr. Donovan's report and the decision to pay benefits was caused by "some confusion over what the proper wage rate should be." Eleven days after agreeing to pay PPD benefits, Snap–On issued and mailed a check for past-due and current PPD benefits. This check, mailed on February 10, 1992, was finally received by Christensen on February 14, 1992. At the hearing, Snap–On's witness observed that the check had to be mailed from Michigan.

Upon being retained, Christensen's attorney had also requested wage information from Snap–On to verify the rate used by Snap–On for healing period benefits. The requested wage information was *never* produced despite five requests made over a three-year period. Not until the January 30, 1992, letter did Snap–On inform Christensen's attorney of the basis for its rate calculation of $286.32. Christensen's counsel immediately advised Snap–On that it had er-

roneously included non-representative weeks in its computation. Nevertheless, Snap–On continued to pay at the wrong rate for an additional one and one-half years. Not until the hearing when Snap-on finally stipulated to the correct rate of $297.66 did it pay the proper rate. At no stage in these proceedings has Snap–On offered an explanation for its failure to timely pay the full amount to which Christensen was entitled.

As we have already noted, Snap–On decided in January 1992 to pay PPD benefits. In February 1992 it paid a lump sum representing twenty-five weeks of past-due benefits plus interest. As previously stated, back benefits were calculated at an incorrect rate and, for an unexplained reason, the interest calculation was also wrong. Because payments are applied first to interest and then to unpaid benefits, *cf. Gail v. Western Convenience Stores*, 434 N.W.2d 862, 864 (Iowa 1989) (payment of judgment), Snap–On delayed paying the full amount of back PPD benefits (even when calculated at the lower, incorrect rate) for 489 days. No excuse for this delay has been tendered because Snap–On has never explained its incorrect rate computation or its incorrect calculation of interest (which resulted in an underpayment of past-due PPD benefits).

At the hearing before the deputy industrial commissioner, Christensen argued she was entitled to penalty benefits because the employer had failed to show a "reasonable or probable cause or excuse" (1) for its failure to pay certain healing period benefits, (2) for its failure to pay permanent partial disability benefits earlier, and (3) for its failure to timely pay benefits at the correct rate. The deputy awarded 50 percent penalty benefits on the unpaid healing period benefits. With respect to the PPD payments, the deputy ruled there was a legitimate dispute as to the permanency of Christensen's injury "at least prior to DeBartolo's evaluation of November 7, 1991." As to the subsequent delay, the deputy stated:

> Once defendant became aware of Dr. De-Bartolo's assessment and a request was made for payment of permanency, payment was made within one or two months of the request. The length of time in-volved does not warrant imposition of a penalty on late payment of permanent disability benefits.

The deputy did not address Christensen's argument concerning the rate differential. On intra-agency appeal, the commissioner adopted the deputy's decision with two modifications not relevant to the penalty issue.

On judicial review, the district court considered the commissioner's failure to award a penalty on the PPD benefits. Without substantive discussion, the court agreed with the commissioner's decision that a penalty based on the delay in commencing PPD benefits was "not appropriate." With respect to the rate differential, the court held Christensen was entitled to additional compensation based on the revised rate, as well as section 85.30 interest on the unpaid PPD compensation. On remand, the commissioner was ordered to compute the proper amount owed and "determine whether that compensation was unreasonably delayed or denied and thus whether [Christensen] is entitled to § 86.13 penalty benefits."

On appeal, Christensen argues she is entitled to penalty benefits for the delay in commencing PPD payments and for the delay in paying the full amount of these benefits. She claims she proved a delay occurred and Snap–On offered no reasonable excuse for the delay. Thus, Christensen contends, the commissioner should be directed to award penalty benefits under section 86.13.

### B. Applicable test under section 86.13

Before we address the merits of Christensen's argument, we must articulate the analytical framework required for an award of penalty benefits under section 86.13. The parties dispute whether the full bad faith test enunciated in *Dolan v. Aid Insurance Co.*, 431 N.W.2d 790, 794 (Iowa 1988), applies.

In *Dolan*, our court first recognized a cause of action against an insurer for bad-faith conduct relating to a claim made by its insured. We adopted the Wisconsin test for bad faith:

> To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy *and*

defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.

*Dolan,* 431 N.W.2d at 794 (quoting *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 376 (1978)) (emphasis added). We went on to hold a reasonable basis exists if the claim is "fairly debatable," whether the debate concerns a matter of fact or law. *Id.*

In *Boylan v. American Motorists Insurance Co.,* 489 N.W.2d 742 (Iowa 1992), we extended this common law tort theory to the workers' compensation situation. In *Boylan,* the employee sued his employer's workers' compensation insurance carrier under a theory of common law bad faith. The district court dismissed the claim holding that Iowa Code section 86.13 provided a statutory remedy for unreasonably delayed or withheld workers' compensation benefits, thereby providing an exclusive remedy and precluding a common-law bad faith claim. *Boylan,* 489 N.W.2d at 742. We rejected this reasoning on appeal and reinstated the employee's claim, observing: "it is unlikely that the legislature intended the penalty provision in section 86.13 to be the sole remedy for all types of wrongful conduct by carriers with respect to the administration of workers' compensation benefits." *Id.* at 744.

As this rationale implies, our decision in *Boylan* required that we interpret section 86.13. We held section 86.13 "recognizes ... an affirmative obligation on the part of the employer and insurance carrier to act *reasonably* in regard to benefit payments in the absence of specific direction by the commissioner." *Id.* at 743 (emphasis added). Since *Boylan,* we have had at least two occasions to consider whether benefits have been delayed or withheld "without reasonable or probable cause or excuse." *See Kiesecker v. Webster City Custom Meats, Inc.,* 528 N.W.2d 109, 111 (Iowa 1995); *Covia v. Robinson,* 507 N.W.2d 411, 416 (Iowa 1993). In *Covia,* we borrowed from our bad faith decisions and held that a reasonable excuse existed if the claim for benefits was "fairly debatable." *Covia,* 507 N.W.2d at 416. In *Kiesecker,* we held a delay in making payments while the insurer investigated the claim was reasonable. *Kiesecker,* 528 N.W.2d at 111.

We believe our interpretation of section 86.13 in these prior cases is consistent with a cardinal rule of statutory construction: "When the text of a statute is plain and its meaning clear, the court should not search for a meaning beyond the express terms of the statute or resort to rules of construction." *Henriksen v. Younglove Constr.,* 540 N.W.2d 254, 258 (Iowa 1995). Based on the plain language of section 86.13, we hold an employee is entitled to penalty benefits if there has been a delay in payment unless the employer proves a reasonable cause or excuse. A reasonable cause or excuse exists if either (1) the delay was necessary for the insurer to investigate the claim or (2) the employer had a reasonable basis to contest the employee's entitlement to benefits. A "reasonable basis" for denial of the claim exists if the claim is "fairly debatable."

Use of the bad faith "fairly debatable" standard does not require that we also use the second element of a bad-faith claim: the insurer's "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *See Dolan,* 431 N.W.2d at 794. Section 86.13 does not require that the lack of a reasonable excuse be due to any particular type of conduct by the insurer, whether negligent, reckless or intentional. The focus is on whether timely payment of the benefits due was made and if not, whether there was a reasonable excuse for the failure to make timely payment of the amount owed.

## V. Commissioner's Penalty Analysis

As noted above, the commissioner refused to award penalty benefits for the delay in commencing PPD compensation. The commissioner found there was no medical evidence indicating Christensen had a permanent injury until Dr. DeBartolo's report in November 1991. We think there is substantial evidence to support the commissioner's finding there was a legitimate dispute as to the permanency of Christensen's injury prior to Dr. DeBartolo's report.

On the other hand, we disagree with the commissioner's manner of evaluating the

subsequent delay in commencing PPD payments. The commissioner concluded the "length of time involved does not warrant imposition of a penalty"; he did not decide whether an excuse existed for the delay and if so, whether any such excuse was reasonable. In the absence of a reasonable excuse for a delay, penalty benefits are mandatory. Only the amount is within the discretion of the commissioner.

■ Here there was a two-month delay between Dr. DeBartolo's report and Snap–On's receipt of a report from its independent medical expert. We think this delay falls within a reasonable time for the investigation of Christensen's medical evidence that she suffered a ten percent permanent impairment, particularly in light of the prior medical records indicating she would recover from her injury. *See Kiesecker,* 528 N.W.2d at 111 (holding a delay in making payments while the insurer investigated the claim was reasonable).

■ The more troublesome delay is that which occurred after Snap–On's receipt of its expert's report. Snap–On argued at the hearing there was a thirteen-day delay between its receipt of Dr. Donovan's report and its decision to pay benefits because there was "some confusion over what the proper wage rate should be." This witness offered no details on what this confusion was, why the correct rate had not been computed when healing period benefits had been paid, or why it took thirteen days to resolve the confusion. The first check was not issued and mailed for an additional eleven days and no explanation was offered for this delay other than that the check had to be mailed from Michigan. We fail to find substantial evidence to support the commissioner's decision not to award penalty benefits for the delay between receipt of Dr. Donovan's report and the commencement of PPD payments.

The existence of "confusion" over the proper rate is not a "reasonable" excuse in that (1) the injury occurred more than a year earlier; (2) some healing period benefits had already been paid, requiring computation of the rate; and (3) Christensen's attorney had attempted for more than seven months to obtain wage records to verify the rate used

by Snap–On. These facts negate any argument by Snap–On that it needed almost two weeks in 1992 to compute the correct rate.

■ With respect to the subsequent eleven-day delay in mailing the check, Snap–On again fails to offer a reasonable excuse. Although the fact the check was mailed from Michigan may explain the four-day delay between mailing and receipt of the check by Christensen, it does not address why it took eleven days to issue the check. Although such a delay may seem minimal to Snap–On, it may not be minor to an employee relying on disability benefits to pay bills. More importantly and contrary to the commissioner's decision, the applicability of section 86.13 does not turn on the length of the delay. Any delay without a reasonable excuse entitles the employee to penalty benefits in some amount. Thus, we reverse the commissioner's decision refusing penalty benefits for the delay in commencing PPD compensation after January 17, 1992. We remand to the commissioner to decide the amount of the penalty to be awarded.

■ We now turn to the final issue, whether substantial evidence supports the commissioner's failure to award penalty benefits for Snap–On's delay in making PPD payments at the proper rate. Again we look for evidence of the employer's reasonable excuse for its failure to pay PPD benefits at the correct rate. Snap–On gave no reason for its failure to pay at the proper rate prior to the time it stipulated to the correct rate. Similarly, Snap–On offered no excuse for its failure to pay the full amount of back benefits due once it did commence PPD payments. In the absence of any excuse, the commissioner was required under section 86.13 to award penalty benefits. We remand for a determination of the amount of these benefits.

VI. Interest Payments

■ Christensen claims principal payments were delayed and that in calculating payments made they must be allocated first toward any interest due. In *Gail,* 434 N.W.2d at 864, we affirmed our adherence to the United States rule regarding allocation of

interest when payment is made toward retiring a judgment. Under that rule, when partial payments are made they are allocated first toward the interest due. Any payment which exceeds the interest due is applied toward the judgment principal. Subsequent interest is to be computed on the remaining principal. We now adopt that rule regarding late payments in workers' compensation cases.

### VII. Compensation Due and Credit Dates

Christensen further argues the commissioner erred in failing to set out due dates for compensation and interest payments. In his order, the commissioner, quoting *Farmers Elevator Co. v. Manning*, 286 N.W.2d 174, 180 (Iowa 1979), correctly explained

> Section 85.30 expresses legislative intent that interest on unpaid compensation be computed from the date each payment comes due, starting with the eleventh day after the injury.... Interest is therefore payable on such installment from that due date, and similarly with the following weekly payments.

Iowa Code section 85.30 provides if these payments are not paid when due, "there shall be added to the weekly compensation payments, interest at the rate provided in section 535.3 for court judgments and decrees." In *Teel v. McCord*, 394 N.W.2d 405, 407 (Iowa 1986), the extent of the worker's permanent partial disability was uncertain until the date of the commissioner's award: September 30, 1982. We held that interest accrued on the award, however, from the date the worker returned to work, May 7, 1974. *Teel*, 394 N.W.2d at 407. This was also the date when the worker's healing period ended pursuant to section 85.34(2). *Id.* We held this was in accord with the intent of section 85.30 and our *Manning* case. *Id.* In reviewing *Teel* in *Thilges v. Snap–On Tools Corp.*, 531 N.W.2d 644 (Iowa 1995), we further enunciated the rule that interest is allowed on each compensation payment from the date it was due and not from the date of the administrative decision.

In *Kiesecker*, 528 N.W.2d at 112, we determined that payments due are considered made when they are mailed *to the claimant.*

We reviewed and confirmed the correctness of that decision in *Thilges*, saying payments are made when placed in the United States mail addressed *to the claimant. Kiesecker*, 528 N.W.2d at 112.

The commissioner instructed the parties to determine the amount of interest owed, if any, and if the parties were unable to reach an agreement they were instructed to seek relief from the commissioner. From the record presented to us, it is not entirely clear whether there is a dispute between the parties as to the amount of interest owed. Therefore, the commissioner's order to the parties to determine the amount of interest they assert is owing is affirmed and this issue is remanded to the commissioner to perform necessary factual inquiries.

### VIII. Costs

 Costs of the hearing before the deputy industrial commissioner were assessed against Snap–On and are affirmed. The industrial commissioner taxed costs to Christensen on the appeal before the commissioner. We review the industrial commissioner's action in taxing costs for an abuse of discretion. *See* Iowa Admin.Code r. 343–4.33(86). Such an allocation of costs clearly falls within the realm of the commissioner's discretion. We affirm. Costs in the district court and on appeal are assessed seventy-five percent to appellant Snap–On and twenty-five percent to cross-appellant Christensen.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**