MYCOGEN SEEDS, Employer and Ace USA, Insurer in Novation for Reliance National Indemnity, Appellees,

v.

Larry SANDS, Appellant,

and

Dow Chemical, Employer and CNA Insurance, a/k/a Continental Casualty Company.

No. 03–0331.

Supreme Court of Iowa.

Aug. 11, 2004.

Rehearing Denied Sept. 21, 2004.

Dennis J. Mahr, Sioux City, for appellant.

Joseph A. Cacciatore of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, and Nathan R. McConkey of Huber, Book, Cortese, Happe & Lanz, P.L.C., Des Moines, for appellees.

LAVORATO, Chief Justice.

In this workers' compensation proceeding involving two successive work-related injuries, the employee, Larry Sands, appeals from a district court judgment affirming the interim commissioner's (commissioner) decision. Sands contends the commissioner and district court erred in applying Iowa's apportionment statute, refusing to abide by the parties' stipulation for the commencement date of permanent partial disability payments for the first injury, denying Sands his spouse's lost wages caused by her transportation of him for medical treatment, and failing to award him penalty benefits.

The employer, Mycogen Seeds, and its insurer on the first injury, ACE USA, cross-appeal to preserve their claim that Sands should not receive double disability payments in the event apportionment does not apply.

We affirm the district court judgment affirming the commissioner's decision on the issues concerning apportionment, the parties' stipulation, and penalty benefits. We reverse the district court's judgment affirming the commissioner's decision on the lost wages claim. We remand for further proceedings on this claim.

Because of the result we reach on the apportionment issue, we do not address the cross-appeal.

## I. Background Facts.

At the time of the arbitration hearing, Sands was fifty-five years old. He is a high school graduate, but was a below average student. Recent testing showed that he had a full scale I.Q. of only seventy-four. His reading skills were at the seventh grade level.

Following his graduation from high school in 1964, Sands had held such jobs as an assembly line worker, a car jockey for a car dealership, a mechanic, and a farmer. These jobs required heavy lifting of up to fifty to seventy-five pounds at times.

In 1972 Sands began working for hybrid seed companies and continued in that work until 1997. He has worked for various companies during this time as a district sales manager. His job duties consisted of harvesting seed, working with dealers who sold seed, and delivering seed to dealers and customers. These duties required Sands to lift seed bags that weighed from twenty-eight pounds to sixty-four pounds.

He lifted 700 to 900 bags of seed per week and up to 300 bags a day during the busy season.

Sands was paid a base salary plus a bonus if he sold more seed in one year as compared to the previous year. His bonus was also based on early cash receipts, collections, and a low return of seed. From 1972 until 1997, there were only two years that Sands did not receive a bonus, and that was either because of weather conditions or a poor farm economy. The largest bonus he received in a year was $12,000.

On June 25, 1991, Sands sustained an on-the-job injury to his lower back. At the time he was lifting fifty-pound bags of seed. After receiving treatment for a suspected herniated disk, his doctor released him without restrictions and gave him no functional impairment rating. In 1994 Sands had a flare-up of low-back symptoms for which he received treatment. He eventually recovered.

On May 16, 1995, Sands was working for Keltgen Seeds. On that date, Sands again sustained an on-the-job injury while picking up unused seed from dealers. In picking up the seed bags, he felt pain in his neck and right shoulder. He sought medical attention for the injury from Dr. Wayne Meylor, D.C., who noted that Sands' primary complaints were in his lower neck and shoulder. Several weeks later, Sands complained to Dr. Meylor of low back and hip pain.

Dr. Meylor referred Sands to Dr. Raymond Sherman, M.D. for evaluation. Dr. Sherman saw Sands on September 3, 1996, following which the doctor recommended conservative treatment for the right shoulder symptoms. Dr. Sherman eventually referred Sands to Dr. Barrie Purves, M.D. for evaluation of Sands' upper back and neck pain complaints.

Dr. Purves saw Sands on April 22, 1997. At that time, Sands told Dr. Purves that he had an acute onset of pain in his upper back into his neck as a result of the May 1995 incident. Sands also informed the doctor of his 1991 low-back injury. Following his examination of Sands, Dr. Purves opined that Sands had severe degenerative disk disease at the C5–6 and C6–7 levels. Because Sands had two years of conservative treatment, the doctor thought Sands was a reasonable candidate for a two-level disk fusion. That operation was done on April 28, 1997. Healing period benefits were paid from April 28, 1997 through May 27, 1997, at which time they were terminated.

Following the operation, Dr. Purves allowed Sands to return to light duty work on July 15, 1997, and imposed a maximum lifting restriction of thirty-five pounds.

On returning to work on July 16, 1997, Sands again suffered an on-the-job injury. At the time, Sands was still wearing a neck brace from his surgery. The injury occurred when he ducked under a fence to get into a field to look at seed that his employer was raising. While attempting to duck under the fence, Sands fell backwards onto the ground and suffered a low-back injury. At the time of this injury, Sands was working for a different company, Mycogen Seeds, which was a successor in interest to Keltgen Seeds.

Dr. Meylor saw Sands on July 16, 1997, for this latest injury. At the time, Sands was complaining of right hip and leg pain. Dr. Purves also saw Sands after this latest injury. On November 25, 1997, Dr. Purves suspected a problem with the L5–S1 disk and scheduled an MRI.

In the meantime, Dr. Purves sent Sands to Dr. Sherman for additional evaluation of Sands' right shoulder complaints. Dr. Sherman ordered an MRI, which showed a partial thickness tear of Sands' right rota-

tor cuff. Injections into the shoulder only provided temporary relief.

The MRI for the low-back injury showed a fragment of a sequestrated disk at L4–5. In December 1997 Dr. Purves opined that this was a recurrence of the back problem Sands had suffered in 1991 and that the current low back and right leg symptoms started when Sands was crawling under the fence in July 1997. Dr. Purves operated on Sands' lumbar spine on December 15, 1997, and found that the sequestrated disk had moved away from the disk space and was free of the spinal column. The back operation was done before the shoulder surgery because of fear that Sands might sustain further damage to his back with movement on the operating table for surgery to his shoulder.

Following the operation, Dr. Purves continued to treat Sands but Sands' right leg pain was not significantly reduced. Eventually, Dr. Purves referred Sands to a pain clinic. The pain clinic eventually referred Sands to Dr. Patrick Bowman, M.D. to try dorsal column stimulation. The procedure resulted in no significant improvement. Dr. Bowman concluded the only treatment option available to treat the pain was the installation of an intrathecal morphine pump. On February 26, 1999, Dr. Lyal Leibrock, M.D. installed the pump, which he indicated would remain installed for permanent pain control. The pump was installed because of "failed back surgery syndrome." Dr. Leibrock indicated that Sands was at maximum medical improvement relative to the lumbar spine.

On May 20, 1999, Dr. Sherman operated on Sands' right shoulder to repair Sands' right rotator cuff tear, as well as performing an acromioclavicular joint resection and glenohumeral ligament repair. Dr. Sherman put Sands at maximum medical improvement on December 6, 1999, and released him with lifting restrictions. Dr.

Sherman determined that Sands had sustained a fifteen percent, whole person impairment as a result of the shoulder injury. He also determined that the surgery was necessary because of the May 16, 1995 incident.

Dr. Meylor opined that Sands' neck and shoulder injury resulted from the May 16, 1995 incident and that Sands had aggravated a preexisting low back condition as a result of the July 16, 1997 incident.

Dr. Purves stated that the July 16, 1997 incident could have aggravated the preexisting condition relating to the herniated disk and led to the need for surgery.

Dr. Meylor asked Dr. Mark Kruse, D.C. to do an impairment evaluation of Sands. Based on that evaluation, Dr. Kruse's opinion was that Sands' low-back surgery was made necessary because of the July 16, 1997 incident and that the injury resulting from this incident caused an additional impairment to Sands' lumbar spine.

Sands was also seen by Dr. Dean Wampler, M.D. for an evaluation of his condition. After reviewing Sands' records, Dr. Wampler opined that Sands' lumbar spine and right leg condition were not related to the July 16, 1997 incident.

Sands' wife, Patricia, drove to several of his medical appointments when he was unable to drive himself. The parties' hometown of Le Mars has no taxi service. Patricia also needed to attend some of the appointments to learn how to catheterize her husband and help him with pain management. She lost wages of $1274.88 while attending these appointments.

Sands began receiving social security disability benefits effective December 12, 1997, and has not worked since then. On August 12, 1998, Sands' employer notified him that it was eliminating his district as well as his current position.

## II. Proceedings.

On May 17, 1999, Sands filed a petition concerning his May 16, 1995 injury before the Iowa workers' compensation commissioner against Mycogen Seeds and Reliance National Indemnity, which is now ACE USA in novation for Reliance National Indemnity. On the same date, Sands also filed a petition concerning his July 16, 1997 injury before the commissioner against Mycogen and Continental Casualty Company. ACE provided Sands benefits for the May 16, 1995 injury, and Continental Casualty provided Sands benefits for his July 16, 1997 injury.

On November 19, 1998, Continental Casualty filed a petition for determination of liability and reimbursement of benefits paid pursuant to Iowa Code section 85.21 (1997) against ACE, alleging that ACE was liable for benefits paid by Continental Casualty for Sands' July 16, 1997 injury.

Following a hearing in which all of the above-cited facts were before a deputy commissioner, the deputy determined that, with respect to the May 16, 1995 injury, Sands had sustained a permanent disability and had sustained a forty percent industrial disability as a result of this injury. (There was no issue as to whether the injury arose out of and in the course of employment.)

The deputy also determined that permanent partial disability payments should commence December 7, 1999, in the amount of $609.07 per week. Additionally, the deputy awarded Sands healing-period benefits from April 28, 1997, through May 27, 1997, and from May 20, 1999, to December 6, 1999. The deputy determined that ACE was responsible for these payments and ordered ACE to reimburse Continental Casualty for any payments it made.

With respect to the injury sustained on July 16, 1997, the deputy found as follows. Sands proved he sustained an injury that arose out of and in the course of his employment. This injury has resulted in Sands being permanently and totally disabled. His permanent total disability benefits, in the amount of $597.12 per week, commence December 11, 1997, and continue as long as he remains permanently and totally disabled. Because he is receiving permanent total disability benefits, there are no healing period benefits.

The deputy awarded as medical expenses Patricia's lost wages as a result of her need to drive her husband to and from medical appointments, ordered the employer and its insurer to pay unpaid medical expenses, and ordered Continental Casualty to reimburse ACE for benefits ACE paid on this claim. Finally, the deputy denied Sands penalty benefits he sought against Mycogen and ACE due to underpayment of benefits based on an incorrect rate. The deputy denied these benefits because there was a fairly debatable question whether Sands' bonus income was regular. (The deputy however found that the bonus income should be included for purposes of determining the rate of compensation.)

All parties appealed to the workers' compensation commissioner. In his decision, the commissioner affirmed all of the deputy's findings and conclusions except as to the following matters. The deputy awarded healing period benefits from May 20, 1999 to December 6, 1999. The commissioner found that Sands was not entitled to such an award because he was then totally disabled by the second injury. *See* Iowa Code § 85.34(3) (2001).

Mycogen and ACE argued that they should not have to pay the 200 weeks of permanent partial disability based on Sands' forty percent industrial disability.

They asserted that a double recovery would result because the deputy also found that Sands suffered a 100% industrial disability, which when combined with the 40% industrial disability allowed Sands a total of 140% industrial disability.

The commissioner agreed with Mycogen and ACE, concluding that the deputy's award created an overlap of disability benefits. Applying Iowa Code section 85.36(9)(c) (apportionment statute), the commissioner apportioned the disability benefits in such a manner as to eliminate the overlap, resulting in benefits for a 100% industrial disability rather than 140%.

In applying section 85.36(9)(c), the commissioner also disagreed with the deputy's finding that the commencement date for any permanent partial disability for the May 16, 1995 injury would be December 7, 1999 (the date of maximum medical improvement) based on the parties' stipulation. Instead, the commissioner determined the permanent partial disability commenced on May 28, 1997, the date that healing period benefits were terminated. In making this determination, the commissioner ignored the parties' stipulation and the deputy's finding based on this stipulation.

Finally, the commissioner, contrary to the deputy's decision, denied Sands' request for reimbursement for his wife's lost wages when she was needed to transport Sands to medical appointments and learn nursing care for him.

Sands filed a petition for judicial review in the district court. Mycogen and ACE filed their own petition for judicial review to preserve their argument that Sands should not receive double weekly benefits for permanent partial and total disability in the event apportionment pursuant to Iowa Code section 85.36(9)(c) did not apply. The district court consolidated the petitions and, following a hearing, affirmed the decision of the commissioner.

Sands appealed and Mycogen and ACE cross-appealed.

### III. Issues.

On appeal, Sands raises the following issues:

(1) whether the commissioner erred in not applying the stipulated date for commencement of permanent partial disability for the May 16, 1995 injury;

(2) whether the commissioner erred by apportioning the disability benefits pursuant to Iowa Code section 85.36(9)(c);

(3) whether the commissioner erred in denying reimbursement of Patricia Sands' lost wages;

(4) whether the commissioner erred in denying Sands penalty benefits because Mycogen and ACE miscalculated the rate for the May 16, 1995 injury and underpaid those benefits.

Mycogen and ACE state that their cross-appeal was filed to preserve the question whether Sands is entitled to receive 200 weeks of double benefits in the event this court finds the apportionment provision of section 85.36(9)(c) does not apply.

### IV. Scope of Review.

Iowa Code chapter 17A governs judicial review of the decisions of the workers' compensation commissioner. Iowa Code § 86.26. Because the commissioner rendered his decision on May 31, 2002, the 1998 amendments to Iowa Code chapter 17A apply. *See Wal–Mart Stores, Inc. v. Caselman,* 657 N.W.2d 493, 498 (Iowa 2003).

In exercising its judicial review power, the district court acts in an appellate capacity. *Grundmeyer v. Weyerhaeu-*

*ser Co.,* 649 N.W.2d 744, 748 (Iowa 2002). In reviewing the district court's decision, we apply the standards of chapter 17A to determine whether the conclusions we reach are the same as those of the district court. *Id.* If they are the same, we affirm; otherwise we reverse. *Id.*

In this case, the issues involve the agency's interpretation of several statutes, its factual determinations, and its application of law to the facts. As to an agency's interpretation of the law, the court shall reverse, modify, or grant other appropriate relief from agency action if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is any of the following:

> Based upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency.
>
> . . . .
>
> Based upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law whose interpretation has clearly been vested by a provision of law in the discretion of the agency.

Iowa Code § 17A.19(10)(*c*), (*l*).

■ Here, the commissioner's decision regarding apportionment of disability benefits, reimbursement of lost wages, and penalty benefits is based upon statutory interpretation. We see nothing in Iowa Code chapter 85 that convinces us that the legislature has delegated any special powers to the agency regarding statutory interpretation in these areas. So such interpretation has not "clearly been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(*c*). We therefore need not give the agency any deference regarding its interpretation and are free to substitute our judgment de novo for the agency's interpretation. *See*

Iowa Code § 17A.19(10)(*c*), (11)(*b*); *see also Mosher v. Dep't of Inspections & Appeals,* 671 N.W.2d 501, 508–10 (Iowa 2003); Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998).

As to the agency's factual determinations, the court shall also reverse, modify, or grant other appropriate relief from agency action if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is

> [b]ased upon a determination of fact clearly vested by a provision of law in the discretion of the agency that is not supported by substantial evidence in the record before the court when that record is viewed as a whole.

Iowa Code § 17A.19(10)(*f*).

"Substantial evidence" is defined as

> the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(*f*)(1).

The phrase "when that record is viewed as a whole" in section 17A.19(10)(*f*) means

> that the adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it. . . .

Iowa Code § 17A.19(10)(*f*)(3).

■ As to the agency's factual determinations regarding apportionment, allowing

reimbursement of lost wages, and penalty benefits, such determinations "are clearly vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(*f*). Workers' compensation cases, such as the one here, are contested cases in which the agency is vested by Iowa Code chapter 85 with the responsibility of determining an employee's right to benefits. Because the agency is charged with such responsibility, the agency must necessarily make factual findings to determine that right. *See* Iowa Code § 85.21; *Zomer v. West River Farms, Inc.*, 666 N.W.2d 130, 132–33 (Iowa 2003). We are therefore bound by the agency's findings of fact if supported by substantial evidence. *See Mosher*, 671 N.W.2d at 508. We can reverse the agency action regarding its findings of fact only if they are not supported by substantial evidence. *Id.* By applying the substantial evidence requirement, we are giving "appropriate deference to the view of the agency with respect to particular matters that have been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(11)(*c*).

Finally, given that factual determinations in workers' compensation cases are "clearly vested by a provision of law in the discretion of the agency," it follows that application of the law to those facts is likewise "vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(*f*). In order to determine an employee's right to benefits, which is the agency's responsibility, the agency, out of necessity, must apply the law to the facts. An agency's application of the law to the facts can only be reversed if we determine such an application was "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*m*). Applying this "irrational, illogical, or wholly unjustifiable" standard, we are likewise giving "appropriate deference to the view of the agency with respect to particular matters that have

been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(11)(*c*).

With these principles in mind, we consider the issues before us.

## V. Analysis.

**A. Apportionment and the parties' stipulation.** Our rule on apportionment of benefits limits apportionment to " 'those situations where a prior injury or illness, *unrelated to the employment*, independently produces some ascertainable portion of the ultimate industrial disability which exists following the employment-related aggravation.' " *Celotex Corp. v. Auten*, 541 N.W.2d 252, 253 (Iowa 1995) (quoting *Varied Enters., Inc. v. Sumner*, 353 N.W.2d 407, 411 (Iowa 1984)) (emphasis added). Generally, the apportionment rule does not apply to work-related conditions or injuries. *Second Injury Fund v. Nelson*, 544 N.W.2d 258, 265 (Iowa 1995).

In *Celotex*, we also recognized the full-responsibility rule: "Apart from statute, in a situation of two successive work-related injuries, 'the employer is generally held liable for the entire disability resulting from the combination of the prior disability and the present injury.' " 541 N.W.2d at 254 (quoting 2 Arthur Larson, *The Law of Workmen's Compensation* § 59.00, at 10–492.329 (1994)). "This rule is actually another way of describing our general rule governing apportionment of disability in workers' compensation proceedings. Absent a statute, we generally do not apportion the disability of two successive work-related injuries." *Excel Corp. v. Smithart*, 654 N.W.2d 891, 897 (Iowa 2002) (citing *Celotex*, 541 N.W.2d at 254).

Iowa Code section 85.36(9)(*c*) is the only statutory provision dealing with apportionment of benefits. It provides:

In computing the compensation to be paid to any employee who, before the accident for which the employee claims compensation, was disabled and drawing compensation under the provisions of this chapter, the compensation for each subsequent injury shall be apportioned according to the proportion of disability caused by the respective injuries which the employee shall have suffered.

Iowa Code § 85.36(9)(c).

The intent of this statute is to prevent overlapping or stacking of disabilities. *Excel,* 654 N.W.2d at 899–900. For example, in this case we have a 40% permanent partial disability and a 100% permanent disability. Is Sands entitled to 140% disability as the deputy found or just 100% as the commissioner found?

In applying the statute, we employ a two-step analysis. We must first determine whether the statute applies. If we determine the statute applies, we must then decide how to apportion the compensation for the disabilities.

In determining whether the statute applies, we focus our attention on the language "was disabled and drawing compensation under the provisions of this chapter." Iowa Code § 85.36(9)(c). The statute does not define "disabled," so we give it its ordinary meaning in the employment context: incapacity to work because of injury. *See, e.g.,* Iowa Code § 85.27 para. 7 ("If, after the third day of incapacity to work following the date of sustaining a compensable injury which does not result in permanent partial disability...."). "[C]ompensation under the provisions of this chapter" in Iowa Code section 85.36(9)(c) includes temporary total and temporary partial disability benefits under Iowa Code section 85.33, permanent partial disability and healing period benefits under Iowa Code section 85.34(1) and (2), and per-manent total disability benefits under Iowa Code section 85.34(3).

 Thus, if an employee is incapacitated to work because of a compensable injury and is receiving temporary total disability, temporary partial disability, permanent partial disability, healing period, or permanent total disability benefits and again suffers a compensable injury, the statute applies. The statute applies even though the employee is not receiving but is entitled to receive such benefits at the time of the second injury. That is because benefits are retroactive to the date they are due. *See Excel,* 654 N.W.2d at 899; *see also* Iowa Code §§ 85.32 ("Except as to injuries resulting in permanent partial disability, compensation shall begin on the fourth day of disability after the injury. If the period of incapacity extends beyond the fourteenth day following the date of injury, then the compensation due during the third week shall be increased by adding thereto an amount equal to three days of compensation."), .34(1) (healing period benefits begin on the first day of disability after the injury and end when employee returns to work, or it is medically indicated that significant improvement from the injury is not anticipated, or until employee is medically capable of returning to employment substantially similar to employment employee was engaged in at the time of injury, whichever occurs first), .34(2) (compensation for permanent partial disability begins at termination of healing period benefits).

As mentioned, once a determination is made that the statute applies, the second step in the analysis requires a determination as to how the compensation for the disabilities is to be apportioned. This second step of the analysis focuses on the following language: "the compensation for each subsequent injury shall be apportioned according to the proportion of dis-

ability caused by the respective injuries which the employee shall have suffered." Iowa Code § 85.36(9)(*c*). "Disability" in this language includes temporary total and temporary partial disabilities, permanent partial disability, and permanent disability. Any combination of these disabilities would require apportionment.

With these principles in mind, we turn to that portion of the commissioner's decision in which he sets out his reasoning as to why the apportionment statute applies:

The 1997 injury occurred at a time when claimant was permanently partially disabled from the 1995 injury and entitled to be receiving permanent partial disability compensation from the 1995 injury under the provisions of section 85.34(2)(*u*). The healing period ended May 27, 1997, and under section 85.34(2) permanent partial disability compensation was due commencing May 28, 1997. He was not actually being paid compensation for the disability at that time, however, because the employer was not complying with the law. Statutes are to be construed based upon the assumption that other pertinent laws are being followed. Accordingly, applicability of section 85.36(9)(*c*) must be determined as if compensation for permanent partial disability compensation from the 1995 injury were being paid when due, namely at the time the 1997 injury occurred. The fact that it was not actually being paid is a fortuitous event that should have no legal impact on the ultimate outcome.

▌ We agree with this reasoning, and therefore agree the apportionment statute applied. As the commissioner correctly points out, Sands was entitled to permanent partial disability when the initial healing period ended on May 27, 1997. And even though Sands was not receiving such compensation at the time, he is considered to have been receiving such compensation because benefits are retroactive to the date he was injured. *See Excel,* 654 N.W.2d at 899. Therefore, when Sands was injured a second time on July 16, 1997, he was "receiving" compensation. Even if the deputy was correct that there was an additional healing period in 1999 for the first injury because of the surgery to the shoulder, that fact does not change the employer's obligation to pay permanent partial disability in the interim.

The parties stipulated that the permanent partial disability commenced on December 7, 1999. The commissioner correctly disregarded this stipulation because the statute requires permanent partial disability to begin "at the termination of the healing period." *See* Iowa Code § 85.34(2). The deputy and the commissioner found that the initial healing period ended on May 27, 1997. Therefore, by law, permanent partial disability commenced on May 28, 1997.

▌ That leaves for our consideration the second step in the analysis—how to apportion the compensation for the disabilities. Sands was entitled to 200 weeks of permanent partial disability beginning May 27, 1997. He was also entitled to permanent total disability commencing December 11, 1997. Therefore on December 11, 1997, Sands was entitled to both permanent partial disability and permanent total disability, resulting in overlapping disabilities. We note that Sands did not challenge the commissioner's method of apportionment. Rather, he only challenged the commissioner's determination that the apportionment statute applied. Any attempt to attack the commissioner's method of apportionment is now too late. *See Gardin v. Long Beach Mortgage Co.,* 661 N.W.2d 193, 196 (Iowa 2003) (refusing to consider an issue raised for the first time on appeal); Iowa R. Civ. P. 1.1603(3).

For all these reasons, we conclude the commissioner correctly determined the apportionment statute applied. Accordingly, we conclude the district court correctly affirmed the commissioner's decision on this issue. Because of the conclusion we reach on the apportionment issue, we do not address the cross-appeal.

**B. Spouse's lost wages.** On this issue the commissioner stated:

Although subsection 7 of section 85.27 provides for reimbursement of lost wages, the section speaks in terms of wages lost by the employee. There is no provision for wages lost by another person. Because of this, there is no statutory authority for this agency to award lost wages to claimant's spouse for her time lost from work driving claimant to his medical appointments.

█ We agree with Sands that, contrary to the commissioner's determination, there indeed is statutory authority for payment of the wages in question. The first paragraph of Iowa Code section 85.27 provides:

The employer, for all injuries compensable under this chapter or chapter 85A, shall furnish reasonable surgical, medical, dental, osteopathic, chiropractic, podiatric, physical rehabilitation, nursing, ambulance and hospital services and supplies therefor and shall allow reasonably necessary transportation expenses incurred for such services.

Iowa Code § 85.27 para. 1.

Although there is no Iowa case authority on point, we find persuasive a Florida case that decided the precise issue under a similar statute. *See Mills v. Walden–Sparkman, Inc.*, 493 So.2d 64 (Fla.Dist.Ct. App.1986). The Florida statute provided:

"An injured employee is entitled, as a part of his remedial treatment, care, and attendance, to reasonable actual cost of transportation to and from the doctor's office, hospital, or other places of treatment by the most economical means of transportation available and suitable in the individual case."

*Id.* at 65 (quoting Fla. Stat. § 440.13(4) (1982)).

In *Mills*, the claimant's husband drove her to her medical appointments, and she sought reimbursement for mileage and her husband's lost wages. *Id.* The commissioner denied the entire claim. *Id.* The court concluded the statute "clearly entitles a claimant to reimbursement of 'reasonable actual cost of transportation'" and remanded the case so transportation costs could be determined under the following conditions. *Id.* The claimant has to prove the "mode of transportation taken was reasonable and economical under the circumstances, taking into consideration the medical condition of the claimant." *Id.* Additionally, the claimant must produce evidence regarding the cost of the chosen manner of travel compared to the cost of "other reasonably available means of transportation." *Id.* At this point, the burden shifts to "the employer and carrier to supply evidence that a more reasonable and economical transportation method exists, of which claimant could have been aware, but chose not to take advantage of." *Id.* at 65–66. The commissioner then weighs the evidence presented and determines how much the claimant should be reimbursed. *Id.* at 66.

The court summarized its ruling as follows:

Therefore, lost wages can qualify as a reimbursable cost but only if the manner of travel was the most economical reasonable way to be transported, the amount was reasonable as to the quality and quantity of services rendered, and

the wages were actually lost by the person providing the transportation.

*Id.*

We think this interpretation and procedure are reasonable for our purposes, especially since we construe the workers' compensation statute in favor of the employee. *Stone Container Corp. v. Castle,* 657 N.W.2d 485, 489, 492 (Iowa 2003) (concluding a laptop computer qualified as reasonable medical appliance for a catastrophically injured employee for whom the computer provided "access to the outside world"). Accordingly, we hold that under section 85.27, an employee may be reimbursed for wages lost by the employee's spouse because of the spouse's absence from work when providing the employee with transportation to obtain authorized medical treatment. The lost wages are allowed under the language "reasonably necessary transportation expenses incurred for such services" in paragraph 1 of section 85.27. Because the commissioner incorrectly interpreted section 85.27, we must reverse the district court judgment affirming the commissioner's decision on this issue. Our adoption of the procedure set out in *Mills* requires us to remand the case to allow the parties to present the necessary evidence called for by the procedure and allow the commissioner to rule on that evidence.

**C. Penalty benefits.** Sands contends he is entitled to penalty benefits against Mycogen and ACE concerning his first injury because he was underpaid benefits based on an incorrect rate due to his bonuses not being included in his wages.

Iowa Code section 86.13 dealing with penalty benefits provides:

If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the workers' compensation commissioner

shall award benefits in addition to those benefits payable under this chapter, or chapter 85, 85A, or 85B, up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

Iowa Code § 86.13 para. 4.

Pursuant to this statute, an employee "is entitled to penalty benefits if there has been a delay in payment unless the employer proves a reasonable cause or excuse." *Christensen v. Snap-on Tools Corp.,* 554 N.W.2d 254, 260 (Iowa 1996).

A reasonable cause or excuse exists if either (1) the delay was necessary for the insurer to investigate the claim or (2) the employer had a reasonable basis to contest the employee's entitlement to benefits. A "reasonable basis" for denial of the claim exists if the claim is "fairly debatable."

*Id.* Whether the issue was fairly debatable turns on whether there was a factual dispute that, if resolved in favor of the employer and its insurer, would have supported their denial of compensability. *Gilbert v. USF Holland, Inc.,* 637 N.W.2d 194, 199 (Iowa 2001).

Penalty benefits were consistently denied by the deputy, the commissioner, and the district court on the ground that the claim was fairly debatable. Mycogen and ACE contend here, as they did in proceedings before all three tribunals, that they indeed had a reasonable excuse in not including the bonuses in calculating Sands' weekly compensation rate. That excuse, they argue, is that Sands' bonuses were irregular.

Iowa Code section 85.61(3) provides that "irregular bonuses" are not to be included in the gross earnings for purposes of calculating a worker's weekly compensation rate. The commissioner ruled as follows on this issue:

[Mycogen and ACE] basically had two arguments as to why the bonuses were not regular. First, that they were not paid every year claimant worked for the employer. Second, that the bonuses were irregular because they varied in amount. Although neither of these arguments has prevailed on appeal, they were legitimate arguments [Mycogen and ACE] were entitled to make and therefore the inclusion of the bonus amounts in claimant's rate was fairly debatable. Benefits were voluntarily paid, but at a rate that did not include the disputed bonuses. It was reasonable to rely on *Noel v. Rolscreen [Co.],* 475 N.W.2d 666 (Iowa Ct.App.1991). A penalty is not appropriate.

We agree with the commissioner's determination. In *Noel,* the court of appeals held that irregular bonuses are not considered as part of an employee's gross earnings as defined in Iowa Code section 85.36 (1989). 475 N.W.2d at 668. The court rejected the employee's argument that Iowa Code section 85.61(12), predecessor to Iowa Code section 85.61(3), supported her position, concluding that the bonus in question was not a regular bonus because it varied in amount, was dependent on several conditions for amount, and was not fixed in terms of entitlement or amount until late in the fiscal year. *Id.* at 667–68. The bonuses here varied in amount, were dependent on several conditions for amount, and were not fixed in terms of entitlement or amount until late in the year.

Accordingly, there was substantial evidence to support the commissioner's determination. In reaching the same conclusion, the district court correctly affirmed the commissioner's decision on this issue.

## VI. Disposition.

In sum, we conclude the commissioner correctly determined the apportionment statute applied and that there was substantial evidence to support his decision regarding penalty benefits. We reject Sands' contention that the commissioner erroneously rejected the parties' stipulation. Accordingly, we affirm the district court judgment affirming the commissioner's decision on these issues.

We conclude the commissioner erroneously concluded that there was no statutory authority for the lost wages claim. We therefore reverse the district court judgment affirming the commissioner's decision on this issue. We remand the case to the district court for remand to the commissioner to allow further proceeding as spelled out in this opinion regarding the lost wages claim.

Because of the result we reach on the apportionment issue, we do not address the cross-appeal.

We have carefully considered all of the issues raised. Those we have not addressed either lack merit or were not properly preserved.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS.**