RUTH GUYON, Appellee, v. SWIFT AND COMPANY et al., Appellants.

No. 45393.

DECEMBER 10, 1940.

Joe B. Tye, for appellee.

Boardman & Cartwright and Harry Druker, for appellants.

STIGER, J.—The material portion of section 1453, 1939 Code, reads:

"1453 Decision on appeal. Any order or decision of the industrial commissioner may be modified, reversed, or set aside on one or more of the following grounds and on no other:

"* * *

"4. If there is not sufficient competent evidence in the record to warrant the making of the order or decision."

The principal question before us is whether there was sufficient competent evidence to sustain the decision of the com-

missioner that there was a causal connection between Mr. Guyon's work in defendant's plant and the injury that caused his death.

Prior to 1938, William Guyon was employed by Roberts and Oaks, operators of a packing plant in Marshalltown, Iowa, as a stationary engineer. In February, the defendant Swift and Company took over the plant and made Guyon its electrician for the entire plant. When Mr. Guyon left his home for work at 8 o'clock on the morning of November 25, 1938, he appeared in good health and had been in apparent good health for many years. About 9 o'clock on the morning of November 25th the electrically operated conveyor which carries the hogs to the several dressing stations did not move when the foreman turned on the switch. Over one hundred employees were unable to perform their duties until the trouble was remedied. The chief engineer called Guyon and Mr. Ball, the plant carpenter, and told them the motor would not start and "to get it going." Mr. Guyon was then in the basement of the plant. He was 60 years old and weighed over 200 pounds. When called he immediately walked up a ramp, then up a series of stairs, climbed up a vertical ladder over 13 feet high to the balcony, then went along the runway of the balcony to the motor which failed to operate the conveyor. It took Mr. Guyon from 20 to 25 minutes to find the trouble and to get the conveyor started. The record does not show where Mr. Guyon found the source of the breakdown. It appears he went back to the main floor during his search for the cause of the trouble. When asked how many times Guyon went up and down the ladder, Mr. Ball stated: "I couldn't say, but perhaps twice." Ball testified Guyon was hurrying, that he was not running but was hurrying to the best of his ability to locate the trouble; that there was an emergency; that Guyon was a little red in the face; that he was excited or nervous because he was having difficulty in locating the trouble.

The engineer testified Guyon was a fast worker; that he was working as fast as he knew how to get the conveyor going.

Soon after Mr. Guyon had started the conveyor he told Ball he had a pain in his chest and did not feel well. Guyon then sat down on a bench.

Mr. Vint, chief engineer, testified he noticed Guyon was trembling. He testified that Guyon told him he had a little pain but would be all right.

Mr. Sandvig, a fellow employee, observed Guyon lying on the bench. He said his color was sallow and he seemed to be in pain. Sandvig then took Guyon to his car for the purpose of taking him home. Observing that Guyon's suffering was increasing, Sandvig took him directly to Dr. Grossman's office, arriving there about 10:30 o'clock. Guyon told Dr. Grossman he had a terrible pain in his chest. He walked with difficulty and was stooped. Dr. Grossman immediately diagnosed his case as coronary occlusion and sent him to the hospital. Mr. Guyon died before they could get him in bed about 11 o'clock on the morning of November 25th.

Dr. Grossman and Dr. Wells performed an autopsy on the evening of November 25th in the presence of Dr. Harris. They found the left coronary artery was very hard, enlarged, and the walls impregnated with calcium. Nodules of lime deposits had formed in the lining of the artery which was not only sclerosed but was also calcified. The lumen or passageway of the artery was reduced to about one half of its normal capacity. A small piece of the calcified wall, which the physicians call a plaque, had broken off, and, after moving with the circulation for about an inch and a half, lodged against one of the nodules and became wedged in the reduced arterial passageway causing a complete obstruction or occlusion of the artery which occlusion resulted in the death of Mr. Guyon. The heart and other vital organs were normal.

All of the medical witnesses agree that death was caused by an occlusion of the left coronary artery which shut off the blood supply to the heart. They are in sharp disagreement as to whether or not the injury causing the death arose out of and in the course of decedent's employment by defendant. Doctors Grossman and Wells were witnesses for claimant and Dr. Harris was a witness for defendant.

I. Defendant's first proposition is that the district court erred in affirming the decision of the industrial commissioner for the reason there is not sufficient competent evidence to warrant a finding that the death of William Guyon arose out of his

employment. In connection with this assignment, we will consider the evidence of Dr. Grossman, a witness for claimant. He testified as to the mechanics of the injury as follows:

"The mechanics would be quite simple. Hence finding an area from which a little piece has been broken, and then within two inches of.that find a narrowing—this little flake or piece would only have to move with the circulation about two inches until it began to block this narrow constriction. Hence the mechanism of it would be some force which could break off a part of this degenerated lime deposit, or intima, in the vessel. The second part would be the blocking due to the inability of this plaque to proceed farther on in the vessel, closing the vessel partially and then completely. I suppose that would be the mechanics of it.

"As this closing is going on the man has a pain, is choked, has symptoms of extreme prostration, because the heart muscle is being depleted from a large area, at least half of the heart, it is being depleted of nourishment and oxygen. Hence the heart is thrown into an extreme state of decomposition, and hence failing. That is part of the mechanics."

Dr. Grossman testified with reference to the pain that always accompanies occlusion as follows:

"The pain does not necessarily—the pain usually does not come immediately upon the beginning of symptoms. The pain begins when this section of the heart muscle is exhausted from not receiving blood supply. That will depend entirely whether this is shut off completely, and in which case it certainly would cause you severe pain and sudden death. But where we have a pain that begins probably in 15 or 20 minutes after an injury and it is the main artery obstructed, then that means that this artery is not completely obstructed at the very beginning, but that repeated impulses of the circulation against this little foreign body, or embolus, will force it farther into or wedge it into the smaller part of the artery and complete the obstruction. And when the obstruction is complete then the pain is more intense. In all these cases of this type we have the pain beginning not as an excruciating pain, but it gets worse every few minutes

until the heart muscle is exhausted. At that time the pain is at its height, we think.''

Dr. Grossman then testified that, based on the autopsy findings and the onset of the pain and his other symptoms, the occlusion must have occurred within an hour and a half prior to the time that he saw him at his office about 10:30 o'clock in the morning. He testified autopsy findings proved exactly where this artery was obstructed and ''my opinion is that you cannot have that kind of an obstruction and go an hour and a half without definite, distinct symptoms. The man's main artery was obstructed before any branching took place in the artery. Therefore a man could not go very long a time without having distinct definite severe symptoms. Occlusion or obstruction had to come on within an hour at least before his symptoms began. The location of the obstruction was at such a critical point that symptoms would have to develop within an hour after this happened.''

Dr. Grossman further testified there was always preceding exertion in coronary occlusion. With reference to this statement he was asked on cross-examination:

''Q. Isn't there some difference of medical opinion in regard to that? A. There might be some. There might have been some in the old times. It was 1912 when Doctor Herrick in Chicago worked this out as a distinct entity. Before that time you can find many, many causes, and many things that would not correspond with things we have today in that line. I think the leading men today will give definite causes and will include exertion in every one of them.''

Dr. Grossman stated that the rapid climbing of a vertical ladder 13 feet high by a man weighing over 200 pounds would be a marked exertion and would very appreciably increase the heartbeat; that worry and the responsibility of finding the source of the trouble under the emergency would likewise increase the heartbeat; that the work performed by Guyon during the 20 to 25 minutes he was searching for the cause of the breakdown constituted an exertion which increased the speed of the circulation of the blood and its pressure in the diseased artery and, in his

opinion, caused the plaque to break off; ''where we have just a localized sclerosis and no high blood pressure, and no enlarging of the heart, the every day exercise has no effect whatsoever, and this man could have lived his regular allotted time, maybe ten or fifteen years, whatever his allotted time would be, if he hadn't been put on effort.''

In reply to a hypothetical question, incorporating the details of the work performed at the plant by Guyon and the findings of the autopsy, the physician stated that in his opinion the work at the plant of Swift and Company on the morning of November 25th had a definite connection with the injury causing the occlusion and resulting death of William Guyon.

Dr. Wells' testimony is substantially the same as the testimony of Dr. Grossman. Their opinions, based on the findings of the autopsy and the history of Guyon's exertions at the plant, were that said exertions which resulted in an increased speed and pressure of the blood in the artery must have caused a breaking off of the plaque and the resulting occlusion. The record does not show that Guyon made any physical exertions prior to being called when the emergency arose.

Defendant claims that either the fact that Mr. Guyon ate a Thanksgiving dinner the day before his death or the fact that he shook down the stove before building a fire at his home early on the morning of November 25th may have caused the plaque to break off and that an opinion that the plaque was broken off by the work at the plant would be based solely on speculation.

Claimant's witnesses definitely testified that the plaque must have broken off within the period of an hour prior to the onset of pain and other symptoms had by Mr. Guyon. Dr. Grossman testified:

''The autopsy showed that the occlusion occurred before there was any branching of the artery. Therefore this type of accident would be of such a severe nature that no man could live from the day before or the night before without having extreme symptoms or dying. Mr. Guyon's symptoms indicated an abrupt onset. The pain begins when this section of the heart muscle is exhausted from not receiving blood supply. That will depend entirely upon whether this is shut off completely. Where we have

a pain that begins in probably 15 or 20 minutes after the injury and it is the main artery obstructed, then that means that this artery is not completely obstructed at the very beginning, but that the circulation will force it farther into the smaller part of the artery and complete the obstruction. Where the onset is gradual the occlusion is in one of the smaller branches. The plaque would not have broken off the day or night before and lodge in this place. He would have had his symptoms at that time.''

Guyon commenced work on the conveyor about 9 a. m. and ended his exertions about 9:25.

He manifested his first symptoms of coronary occlusion, he first experienced pain, from 15 to 20 minutes after he completed his exertions. The pain gradually increased in intensity and by the time he reached Dr. Grossman's office about 10:30 and from that time until his death a half hour later he suffered extreme pain. We will compare Guyon's pathological history with the evidence of claimant's medical witnesses. They testified that exertion preceded coronary occlusion; that the plaque moved with the circulation about an inch and a half to the place where it was stopped by the nodules; that it gradually became wedged into the lumen until by the repeated impulses of the circulation it caused a complete obstruction and death; that the pain would increase in proportion to the amount of obstruction; that from the location of the obstruction in this main artery ''the occlusion had to come on within at least an hour before his symptoms began.''

The conclusions of Doctors Grossman and Wells were based primarily on the autopsy and the undisputed facts as to Guyon's exertions at the plant within an hour prior to the onset of pain. The plaque traveled only an inch and a half after it broke off until the occlusion began and the opinion of the physicians is that the first onset of pain suffered by Guyon must have commenced well within an hour from the time the plaque broke off, that is, pain necessarily began within an hour after the plaque broke off. Each of these witnesses testified there was a definite connection between the work at the plant and the injury which resulted in the workman's death.

The commissioner, after an exhaustive review of the medical evidence and the exertions of Mr. Guyon at the plant the morning of his death, said:

"With the foregoing facts of record in mind, we are forced to the conclusion that it is ample and sufficient to support the opinion expressed by at least two medical witnesses in the case to the effect that in their opinion the exertion incident to the work in question was a contributing cause that brought about the detachment of the offending plaque with its attendant results, and as we view it meets the standard of proof required by the rules of evidence in such cases, therefore not within the realms of speculation."

The testimony of Dr. Harris made a conflict in the evidence on the issue before us. In view of the testimony of Dr. Wells and Dr. Grossman, we are of the opinion the trial court was right in finding there was sufficient competent evidence to sustain the decision of the commissioner.

▇ II. There is evidence in the record that because of the diseased condition of the artery the small plaque would have ultimately broken off by the ordinary flow of blood and caused the occlusion. There is evidence to sustain the conclusion of the commissioner that the plaque was broken off through increased pressure and speed of the blood caused by the exertion of Guyon.

This court has uniformly held that though an injury aggravates or accelerates a disease it is compensable if death results from or was hastened by the injury. West v. Phillips, 227 Iowa 612, 288 N. W. 625; Almquist v. Shenandoah Nurseries, 218 Iowa 724, 254 N. W. 35, 94 A. L. R. 573; Hanson v. Dickinson, 188 Iowa 728, 176 N. W. 823.

▇ We do not agree with the defendant's proposition that the opinions of Doctors Grossman and Wells were based on mere guess and conjecture. The opinions are obviously based on established physical facts. In connection with this contention we quote from the decision of the industrial commissioner:

"However, claimant's case is not required to depend entirely upon inference. Dr. Grossman who did the autopsy, testified, as did his assistant, that the exertion incident to the work in ques-

tion was in his opinion the causative connecting factor that caused the plaque to become detached with its attendant results. No one can read the record testimony of the doctor without being convinced that he has given a great deal of study and attention to heart and artery afflictions, supplemented with a wealth of actual experience that has come within his long and varied personal professional experience, supported as he was by the testimony of his assistant who took part in the autopsy."

We have carefully considered defendant's remaining assignments of error and are confident that none of the propositions urged justify a reversal. The case is affirmed.—Affirmed.

RICHARDS, C. J., and HALE, MILLER, SAGER, BLISS, HAMILTON, OLIVER, and MITCHELL, JJ., concur.