P.D.S.I. (3M Midwest Drivers)
and Travelers Insurance
Company, Appellants,

v.

Carolyn PETERSON, Surviving Spouse
of Wayne Peterson, Appellee.

No. 03–0260.

Supreme Court of Iowa.

Aug. 11, 2004.

William D. Scherle and Aaron T. Oliver of Hansen, McClintock & Riley, Des Moines, for appellants.

Thomas J. Reilly of Thomas J. Reilly Law Firm, P.C., Des Moines, and E.J. Kelly and Erin Q. Pals of Hopkins and Huebner, P.C., Des Moines, for appellee.

LAVORATO, Chief Justice.

The interim workers' compensation commissioner (commissioner) found that claimant's husband died from a work-related heart attack. The commissioner granted claimant death benefits but denied her claim for penalty benefits. The employer and its insurer sought judicial review in the district court and the claimant cross-appealed. The district court affirmed on both appeals. The employer and its insurer appeal from that decision, and the claimant cross-appeals. We affirm.

## I. Background Facts.

Wayne Peterson was an over-the-road truck driver for P.D.S.I., which leased drivers to 3M Companies to haul 3M's freight. Peterson spent five to six days per week on the road with a driving partner.

Peterson and Russell Mersman were driving partners and had been such for two years. The drivers were paid by the hour and by the mile, so Peterson and Mersman tried to keep the truck running twenty-four hours per day because that is how they and the company made the most money.

The pair followed a regular routine when they were on the road together. The drivers changed at 4 a.m., 12 noon, and 8 p.m., and each driver would drive for an eight-hour shift with time off for sleeping and eating meals.

On October 12, 1997, Peterson and Mersman started their final road trip together. They met in Ames to pick up the first trailer to deliver. According to Mersman, it was an average week, and they were not under any particular scheduling or delivery pressure. Early in the week, Peterson had complained to Mersman that he was experiencing cold symptoms, including chest congestion, and that he did not feel well. Despite these symptoms, Peterson maintained the normal driving routine he and Mersman had established for themselves for the prior two years.

The evidence shows that on October 16, Peterson was off duty 5.5 hours, he was in the sleeper berth for 11 hours, he drove

6.5 hours, and he was on duty but not driving for 1 hour. On that day he drove 377 miles, which was within the normal range expected of a professional over-the-road truck driver.

Some time before 2:30 p.m. on the 16th, Peterson telephoned the company dispatcher, Lee Olson. Olson's telephone log noted the following:

Wayne Peterson at Greenville said he wasn't feeling good yesterday and not much better today. Has lung congestion and coughing a lot. Thought it might have been something to do last week with a drop and hooking of trailer, or it might be from when they were broke down on the road and were in a wet, cold type of weather and maybe it's cold from that. He didn't ask to get switched through to Jan to report it. When I asked him if he wanted to report it, he said he'll see how he feels later on, or might have to get off in Des Moines en route to Hutch.

According to Olson, he said to Peterson during that call:

"If you're feeling sick in any way, I need you to go right now, get to any medical facility you want to, the soonest one and get checked out and call and give us an update of what is going on with you."

As a dispatcher, Olson had company authorization to give drivers permission to seek necessary medical treatment.

At approximately 2:30 p.m. on the same day, Peterson again telephoned the company dispatcher. Olson's log noted the following:

Wayne Peterson en route from Decatur to Hutch on Route 155 at Cornersville, TN complaining of shortness of breathing and breath problems. Said same occurrence at Greenville yesterday but not as bad as today. Will get off in Des Moines on Friday and get to the doctor for observation and call us with update

of his condition. Mersman will single tail end of route.

During this second call, Olson said, "Wayne, you have the right[,] right now[,] to go to any medical facility and get checked out. You should do that." Peterson said he would ride it out until he reached Des Moines.

Following this conversation, Peterson drove from 3:30 p.m. until 8 p.m., when they reached Marion, Illinois. From 8 p.m. until 9 p.m., Peterson and Mersman were off duty and ate dinner together at a truck stop in Marion. At 9 p.m., Peterson went to the sleeper berth.

Sometime during the early morning hours of the 17th, Peterson emerged from the sleeper. According to Mersman, Peterson was sweating profusely and having trouble breathing. Peterson said, "I'm sick. I got to get to the hospital." Mersman drove five miles to a truck stop in Kingdom City, Missouri, where an attendant called 911 and requested an ambulance. After the ambulance arrived, paramedics transported Peterson to Callaway Community Hospital in Fulton, Missouri. Later, Peterson was flown to the University Hospital at Columbia, Missouri for cardiac care.

At the latter hospital, Peterson was diagnosed as having suffered a myocardial infarction (heart attack). Despite efforts to treat Peterson, he died five days later on the 22nd. The cause of death was listed as septic shock, extensive bilateral pneumonia, and secondary cause as acute myocardial infarction with cardiogenic shock.

## II. Proceedings.

Peterson's widow, Carolyn Peterson (claimant), filed a workers' compensation petition on September 9, 1999, against P.D.S.I. and its insurer, Travelers Insur-

ance Company (collectively "employer"). The petition alleged the claimant was entitled to death benefits as a result of "her husband's work-related death." Later, the claimant filed an amended petition seeking penalty benefits for benefits unreasonably delayed or denied. She alleged she had not received any payments in the two years and ten months since her husband's death.

The deputy commissioner who heard the matter awarded the claimant the following benefits: .714 weeks of temporary total disability benefits ($599.88 per week) for the time the decedent was hospitalized prior to his death, death benefits ($599.88 per week for life or until remarriage), medical expenses ($2309.00), and burial expenses ($2845.75). *See* Iowa Code §§ 85.27, .28, .31, .33 (2001). The deputy also ordered the employer to pay $12,000 to the Second Injury Fund of Iowa. *See id.* § 85.65. Accrued benefits were to be paid in a lump sum with interest. *See id.* § 85.30. The deputy denied the claimant's request for penalty benefits. *See id.* § 86.13.

The employer appealed the deputy's decision to the Iowa workers' compensation commissioner. The claimant cross-appealed, contesting the award of medical expenses based on a scrivener's error. She further contested the denial of penalty benefits.

The commissioner corrected the amount of medical expenses, increasing it to $65,594.25, but otherwise affirmed the deputy's decision.

The employer filed a petition for judicial review, challenging the commissioner's decision awarding death benefits, and the claimant cross-appealed the decision denying penalty benefits. The district court affirmed the commissioner's decision on the appeal and cross-appeal.

The employer appealed and the claimant cross-appealed. We set out additional facts in connection with the issues we discuss.

## III. Issues.

 An employee with a pre-existing heart condition or defect may recover for a heart attack occurring on the job upon a showing of legal and medical causation. *Riley v. Oscar Mayer Foods Corp.*, 532 N.W.2d 489, 492 (Iowa Ct.App.1995). Proving both prongs establishes that the injury arose out of the employment. A claimant establishes legal causation under any one of the following circumstances:

(1) [when] heavy exertions ordinarily required by the job are superimposed on a defective heart, aggravating or accelerating the previous condition; (2) unusually strenuous employment exertion is superimposed on a preexisting diseased condition; or (3) damage results from continued exertion required by the employment after the onset of the heart attack symptoms.

*Wilson v. Good Will Publishers*, 671 N.W.2d 479, 480–81 (Iowa 2003). We have found medical causation when the employee's continued driving after the onset of his symptoms materially aggravated and accelerated the impact of the myocardial infarction. *Varied Enters., Inc. v. Sumner*, 353 N.W.2d 407, 410 (Iowa 1984).

Although the claimant must establish both legal and medical causation, we limit our discussion to the legal causation issue because the employer concedes medical causation exists. There was evidence from two medical experts that Peterson suffered his myocardial infarction while on the road on October 16. Additionally, these experts opined that Peterson's continued driving after the onset of heart attack symptoms materially and substantially aggravated his

myocardial infarction and thus was a significant causal factor in his death.

At issue in this appeal is the third test for legal causation: damage results from continued exertion required by the employment after the onset of heart attack symptoms. Concerning this test for legal causation, the commissioner relied on *Varied Enterprises, Inc. v. Sumner*, 353 N.W.2d 407 (Iowa 1984). In *Varied Enterprises*, the claimant—an over-the-road truck driver—suffered a myocardial infarction while driving a truck pursuant to his employment.

The issues in *Varied Enterprises* were whether there was substantial evidence to support the commissioner's findings that (1) the claimant felt impelled to continue driving despite his physical discomfort because of his concern about the effect of lost time on his probationary status with his employer, and (2) the claimant's actions in continuing to drive after the onset of the myocardial infarction materially aggravated the effect of the myocardial infarction. The court noted that the "impelled-to-continue" challenge appeared to be tied to the court's reference in *Sondag v. Ferris Hardware*, 220 N.W.2d 903 (Iowa 1974), to the following observation:

> The most obvious relevance of this element [continuing exertion after symptoms] is in showing causal connection between the obligations of the employment and the final injury; for if the workman, for some reason, feels impelled to continue with his duties when, but for these duties, he could and would have gone somewhere to lie down at once, the causal contribution of the employment to the aggravation of the condition is clear.

*Varied Enters.*, 353 N.W.2d at 409 (alteration in original) (quoting 1A A. Larson, *The Law of Workmen's Compensation* § 38.64(c), at 7–145 (1972)).

The commissioner in the case before us noted that in *Varied Enterprises* the court held (1) there was sufficient evidence to support the finding that claimant felt impelled to continue driving because of the rather shaky nature of his probationary status with his employer, (2) contrary to the employer's and insurer's contention, the claimant was not absolutely required to have known there was a health deprivation in order to make a heart attack claim compensable, and (3) the claimant's actions in continuing to work after he sustained a myocardial infarction materially aggravated the effect of his underlying heart attack.

Following the *Varied Enterprises* analysis, the commissioner here found that Peterson continued to work after he sustained a myocardial infarction and that he was impelled to continue working. The commissioner therefore concluded the claimant had established that Peterson engaged in continued exertion once he sustained the heart attack and for that reason proved the third test for legal causation. Finally, the commissioner found that the claimant had established medical causation based upon testimony that Peterson's continued driving after the onset of his myocardial infarction materially and substantially aggravated the infarction.

On the issue whether Peterson felt impelled to continue driving, the district court noted that both the deputy and the commissioner found that Peterson was impelled to continue working. That finding, the district court noted, appeared to be based on a subjective evaluation of Peterson's state of mind. Thus, the district court injected the issue of whether a subjective or objective feeling of the employee is contemplated by the impelled-to-continue language, concluded that the subjective feeling of the employee controlled, found there was substantial evidence to support

the commissioner's finding that Peterson subjectively felt impelled to continue working, and affirmed the commissioner's ruling.

The issue here on legal causation has now morphed into whether a subjective or objective standard is to be applied in determining whether the employee was impelled to continue working. The district court contrasted the two standards by adopting the following definitions:

> **objective standard.** A legal standard that is based on conduct and perceptions external to a particular person. In tort law, for example, the reasonable-person standard is considered an objective standard because it does not require a determination of what the defendant was thinking.

> **subjective standard.** A legal standard that is peculiar to a particular person and based on the person's individual views and experiences. In criminal law, for example, premeditation is determined by a subjective standard because it depends on the defendant's mental state.

*Black's Law Dictionary* 1413 (7th ed.1999).

Following up on the district court's characterization of the issue, the employer contends here that the district court should have applied an objective standard to determine whether a reasonable person in Peterson's situation would have believed he was required to continue working. In that regard, the employer argues Peterson was told to get medical care and not to proceed if he did not want to. Therefore, the employer concludes, Peterson could not have been impelled to continue working. But, if Peterson was impelled to continue, it was for personal gain or a mistaken belief, in which case, the injury was not compensable.

Also at issue here is whether there was substantial evidence to support the commissioner's conclusion that Peterson felt impelled to continue driving following the onset of heart attack symptoms.

The cross-appeal presents the issue of whether there was substantial evidence to support the commissioner's decision to deny penalty benefits.

## IV. Scope and Standards of Review.

Iowa Code chapter 17A governs judicial review of the workers' compensation commissioner's decisions. Iowa Code § 86.26. In this case the commissioner rendered his decision on June 11, 2002. Therefore the 1998 amendments to Iowa Code chapter 17A apply. *See Wal–Mart Stores, Inc. v. Caselman,* 657 N.W.2d 493, 498 (Iowa 2003).

When it exercises its judicial review power, the district court acts in an appellate capacity. *Mycogen Seeds v. Sands,* 686 N.W.2d 457, 463 (Iowa 2004). Our review of the district court's decision requires us to apply the standards of Iowa Code section 17A.19(10) to determine whether the conclusions we reach are the same as those of the district court. *Id.* at 464. If they are the same, we affirm; otherwise we reverse. *Id.* at 464.

In this case, the issues involve the agency's application of case law, its factual determinations, and its application of the law to the facts. Here, as mentioned, the first issue centers on legal causation-damage resulting from continued exertion required by the employment after the onset of heart attack symptoms. The second issue concerns the claimant's entitlement to penalty benefits.

The proof required to establish both legal causation and entitlement to penalty benefits requires a legal interpretation. The legal causation test has resulted from case law development and does not appear

in statutes covering workers' compensation. The entitlement to penalty benefits flows from statute and our interpretation of the statute.

We see nothing in the workers' compensation statutes that convinces us that the legislature has delegated any special powers to the agency regarding its interpretation of case law or statutes. So the agency's interpretation has not "clearly been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(c). We therefore need not give the agency any deference regarding its interpretation, and we are free to substitute our judgment de novo for the agency's interpretation. *See id.* § 17A.19(10)(c), (11)(b); *see also Mycogen,* 686 N.W.2d at 464.

As to the agency's factual determinations regarding legal causation and whether the claimant is entitled to penalty benefits, such determinations are "clearly vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(f); *see also Mycogen,* 686 N.W.2d at 464. We are therefore bound by the agency findings of fact if "supported by substantial evidence in the record before the court when that record is viewed as a whole." *Id.*

> Substantial evidence is
>
> the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(f)(1).

"When that record is viewed as a whole" simply means

> that the adequacy of the evidence in the record before the court to support a particular finding of fact must be judged

in light of all the relevant evidence in the record cited by any party that detracts from the finding as well as all of the relevant evidence in the record cited by any party that supports it. . . .

*Id.* § 17A.19(10)(f)(3).

Finally, the application of the law to the factual determinations in workers' compensation cases is "vested by a provision of law in the discretion of the agency." *Id.* § 17A.19(10)(f); *see also Mycogen,* 686 N.W.2d at 464. We can therefore only reverse the agency's application of the law to the facts if we determine such an application was "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(m); *see also Mycogen,* 686 N.W.2d at 464.

With these principles in mind, we now turn to the issues in this case.

## V. Analysis.

■ **A. Background.** To understand how the concept of "impelled to continue" has crept into our workers' compensation law as an independent test for legal causation, we need to revisit *Sondag v. Ferris Hardware,* 220 N.W.2d 903 (Iowa 1974).

In *Sondag,* this court discussed two concepts of work-related causation under which a claimant with a pre-existing heart condition was permitted to recover. The first concept involved a situation where the work ordinarily requires heavy exertions which, superimposed on an already-defective heart, aggravates or accelerates the condition, resulting in a compensable injury. 220 N.W.2d at 905 (citing *Littell v. Lagomarcino Grupe Co.,* 235 Iowa 523, 17 N.W.2d 120 (1945)). To prove this, the claimant has to show the employment contributed an exertion greater than that of non-employment life. *Id.*

Under the second concept, compensation is allowed when the medical evidence

shows an instance of unusually strenuous employment exertion, imposed upon a pre-existing diseased condition, resulting in a heart injury. *Id.* (citing *Guyon v. Swift & Co.*, 229 Iowa 625, 295 N.W. 185 (1940)).

The claimant in *Sondag* had experienced chest pains in the past, particularly on the heavy exertion frequently required by his employment. *Id.* at 904. Eventually, he was diagnosed as having angina pectoris and nitroglycerin was prescribed. *Id.* Almost a year following this diagnosis, the claimant started having chest pains on the job while unloading washing machines weighing 300 to 400 pounds. *Id.* He continued this strenuous activity for about an hour following the onset of his pain. *Id.* He finally told his employer he could not continue working and was taken to the hospital where he was diagnosed as suffering from a myocardial infarction. *Id.*

The claimant in *Sondag* never tried to medically prove a compensable injury under the first concept. *Id.* at 906. Rather he tried to prove his activity on the date in question causally contributed to his injury. *Id.* However, his medical experts would not make that connection, resulting in the commissioner concluding the claimant had failed to prove he had sustained a personal injury arising out of and in the course of his employment. *Id.* In response to this finding, the court said:

Apparently the devastating dearth of the evidence in this regard caused the commissioner to virtually overlook the uncontroverted medical evidence [medical opinion in response to hypothetical question] that claimant's continuing to work after the coronary onslaught would have aggravated the effect of the obstruction in the heart artery.

*Id.* at 906.

The court then made the following pronouncement:

It has long been legally recognized that damage caused by continued exertions required by the employment after the onset of a heart attack is compensable. The industrial commissioner so held under facts strikingly similar to those in this case ... [citing a commissioner decision and a commissioner's biennial report]. This concept has found application in the following representative cases from other jurisdictions ... [citing state and federal cases].

*Id.*

In further support of this pronouncement the court cited the following:

The most obvious relevance of this element [continuing exertion after symptoms] is in showing causal connection between the obligations of the employment and the final injury; *for if the workman, for some reason, feels impelled to continue with his duties when, but for these duties, he could and would have gone somewhere to lie down at once, the causal contribution of the employment to the aggravation of the condition is clear.*

*Id.* (emphasis added) (quoting 1A *Larson's Workmen's Compensation Law* § 38.64(c), at 7–145).

Unfortunately, the italicized language in the above quote from this treatise became the impelled-to-continue test in future cases and overshadowed the simple rule that damage caused by continued exertion required by the employment after the onset of a heart attack is compensable. *Varied Enterprises, Inc. v. Sumner*, 353 N.W.2d 407 (Iowa 1984), was the first case to apply the impelled-to-continue test. This court stated, however, that the impelled-to-continue "example" was not "an absolute requirement that a claimant be motivated to continue working in the face of a known health deprivation in order to

produce a compensable situation." *Varied Enters.*, 353 N.W.2d at 409.

*Wilson v. Good Will Publishers*, 671 N.W.2d 479 (Iowa 2003), is our latest case employing the impelled-to-continue test. In that case, we affirmed the commissioner's finding that the claimant failed to establish legal causation for his workers' compensation claim, although he asserted that he felt impelled to keep working while traveling for his employer after he suffered a heart attack. *Wilson*, 671 N.W.2d at 481–82. We held evidence that the claimant (1) did not feel he would lose his job if he stopped for medical attention, (2) was free to seek medical attention whenever he felt ill, and (3) was not under orders to continue working after his symptoms began supported the commissioner's finding that the claimant did not meet the impelled-to-continue test. *Id.* at 482.

In *Wilson*, we expressly left open the question whether the impelled-to-continue test is judged by a subjective or objective standard. *Id.* As mentioned, this objective versus subjective standard is the fighting issue on this appeal, an issue the district court injected into this case. The issue demonstrates how far off the mark we are from a workers' compensation standpoint and the simple rule this court announced in *Sondag*.

Based on our review of *Sondag*, we conclude this court did not intend the impelled-to-continue language to be an independent test for establishing legal causation. Rather, as clearly demonstrated in *Sondag*, the impelled-to-continue language was intended as an explanation of the third test for establishing legal causation: damage results from continued exertion required by the employment after the onset of heart attack symptoms.

We think the language "exertion required by the employment" was meant to mean exertion required by the job duties—in this case, driving—and not exertion required because the employer is requiring or demanding such exertion. The latter interpretation—exertion required because the employer is requiring or demanding such exertion—puts the onus on the employee to prove his or her continuing to work was required by the *employer* despite the employee's symptoms. Such an interpretation underlies our decisions in *Varied Enterprises* and *Wilson* and is one the employer is suggesting here. This interpretation is fault-based, which has no place in workers' compensation law. Finally, we note that none of the cases cited in *Sondag* for the third test of legal causation even mention the impelled-to-continue language. *See, e.g., Aetna Cas. & Sur. Co. v. Johnson*, 278 F.2d 200 (6th Cir.1960); *S. Stevedoring Co. v. Henderson*, 175 F.2d 863 (5th Cir.1949).

For all these reasons, in this and future cases, we abandon any analysis based on the notion that the impelled-to-continue language is a requirement for establishing legal causation under the third test in heart attack cases arising out of the workers' compensation law. Where, as here, liability is based on the third test of legal causation, we simply focus on the language "damage results from continued exertion required by the employment after the onset of heart attack symptoms." "Required by the employment" simply means exertion required by the job duties and not exertion specifically required or demanded by the employer in the face of the employee's illness or symptoms. Thus, if the evidence shows that the employee for some reason—whatever that reason might be—continues with his or her job duties, then any aggravation of a heart attack suffered by the employee while performing those duties, which is attributable to that exertion, is compensable.

As mentioned, the commissioner found that despite the symptoms Peterson was experiencing, he continued driving. The commissioner also found that Peterson suffered a myocardial infarction while on the road, and that his continued driving after the onset of heart attack symptoms materially and substantially aggravated his myocardial infarction and thus was a significant causal factor in his death, a finding the employer does not dispute. We conclude there was substantial evidence to support these findings. The commissioner was therefore correct in determining that the claimant established both legal and medical causation, entitling the claimant to benefits. The district court was likewise correct in affirming the commissioner's decision on this issue.

That brings us to the final issue in the case.

■■■■ **B. Penalty benefits.** In her cross-appeal, the claimant contends she is entitled to penalty benefits pursuant to Iowa Code section 86.13 because of the employer's failure to pay death benefits. That provision pertinently provides:

> If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the workers' compensation commissioner shall award benefits in addition to those benefits payable under this chapter ... up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

Iowa Code § 86.13.

Under this provision, an injured employee is entitled to penalty benefits unless the employer proves a reasonable cause or excuse for the delay or denial. *Christensen v. Snap–On Tools Corp.*, 554 N.W.2d 254, 260 (Iowa 1996).

> A reasonable cause or excuse exists if either (1) the delay was necessary for the insurer to investigate the claim or (2) the employer had a reasonable basis

to contest the employee's entitlement to benefits. A "reasonable basis" for denial of the claim exists if the claim is "fairly debatable."

*Id.*

The claimant contends the employer never filed a First Report of Injury until two years after Peterson's death even though it had knowledge of his death and the spouse's claim several weeks after Peterson's death. (Peterson died on October 22, 1997; the employer prepared the First Report of Injury on October 23, 1997 and filed it on September 30, 1999.) Pursuant to Iowa Code section 86.11, the employer is required to file the report within four days after having notice of the employee's death. The claimant also contends that the employer had a duty to investigate the circumstances of Peterson's death but never conducted one. Because the employer failed to file a timely First Report of Injury and never investigated, the claimant argues the employer had no reasonable basis to deny the claimant's claim.

The commissioner denied the penalty benefits claim, finding:

> In the present case, penalty benefits are not warranted. There is a fairly debatable claim involved. Work place injuries involving heart attacks are always complicated questions of fact and law. These types of cases require both legal and medical causation. It was not unreasonable for [the employer] to deny payments for benefits, given claimant's family history, lifestyle, and personal problems. [The employer is] not liable for penalty benefits.

We agree. There is substantial evidence to support the commissioner's findings. Because the employer might not have investigated or filed the First Report of Injury in a timely manner does not change the fact that there was a fairly

debatable question. Finally, we cannot say that the commissioner's application of the law to the facts here was irrational, illogical, or wholly unjustifiable. The commissioner was therefore correct in denying the claimant's claim for penalty benefits, and the district court was correct in affirming the commissioner's decision on this issue.

## VI. Disposition.

In sum, we hold that there was substantial evidence in the record when the record is viewed as a whole to support the conclusion that the claimant established both legal and medical causation regarding the aggravation of the myocardial infarction that Peterson suffered, thereby entitling the claimant to benefits. We therefore affirm the district court judgment affirming the commissioner's decision on this issue.

There was also substantial evidence in the record before the court when the record is viewed as a whole to support the commissioner's finding that the claimant was not entitled to penalty benefits. We therefore affirm the district court judgment affirming the commissioner's decision on this issue as well.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**