# IN THE COURT OF APPEALS OF IOWA

No. 24-0236
Filed December 18, 2024

**H.J. HEINZ COMPANY and LIBERTY MUTUAL INSURANCE CO.,**
    Petitioners-Appellants,

**vs.**

**TERRY TILTON,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.

An employer and its insurer appeal from the district court's ruling denying their petition for judicial review of the Iowa Workers' Compensation Commissioner's remand decision. **AFFIRMED.**

Nathan R. McConkey of Huber, Book, Lanz & McConkey, PLLC, West Des Moines, for appellants.

Thomas M. Wertz and Mindi M. Vervaecke of Wertz Law Firm, Cedar Rapids, for appellee.

Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

H.J. Heinz Company (Heinz) and Liberty Mutual Insurance Company (Liberty) appeal from the district court's ruling denying their petition for judicial review of the Iowa Deputy Workers' Compensation Commissioner's (Commissioner) remand decision. They argue the Commissioner erred by: (1) failing to make explicit findings on Terry Tilton's credibility; (2) determining the discovery rule date to be April 15, 2013; (3) determining Tilton's low back and mental conditions were causally related to and permanently aggravated by her employment with Heinz and caused her to be permanently and totally disabled; and (4) determining Tilton was entitled to penalty benefits. We affirm, discerning no errors of law and finding substantial evidence supports all the Commissioner's factual findings and determinations.

## I.  Background Facts and Proceedings

Tilton began working for Heinz in 1999 and continued her employment there until resigning based on disability on April 15, 2013. She held several positions during her career at Heinz, but her time serving in the "Clean As You Go" position at the company is the period of her employment most relevant here. Around 2009 or 2010 she bid into the "Clean As You Go" position—which both her testimony and official job description described as a very physically demanding position.

While in that position, Tilton was working on her feet for the entire day. She filled and transported barrels of chlorine that weighed up to 100 pounds, cleaned up messes on the jobsite by pulling spilled food product with a squeegee, used a shovel to lift that squeegeed product about waist high and dump it into garbage cans, and pushed those garbage cans up a ramp. She testified that the trash cans

were heavy because the food product inside was very wet. She also stacked pallets weighing up to twenty-five pounds ten levels high, which required her to use her back and stomach. She often crouched and crawled to clean drains, moved barrels of food product, and attended to other cleaning duties. Heinz's official job description confirmed that this position requires frequent or occasional bending, twisting, squatting, kneeling, and reaching. The job description also indicated "yes" next to the requirements of "repetitive motion," "pushing/pulling," "fine manipulation," and "simple grasping." In 2013, Tilton's wage for this position was $15.13 per hour.

Tilton first began treatment with a chiropractor in 2000. She later started treatment for low back and left leg pain with Dr. Matthew Gray in November 2004. On December 1, 2004, Tilton had a magnetic resonance imaging scan (MRI) which showed a small focal disc herniation on the left side at L4-5. A second MRI conducted on July 30, 2005, showed no significant change at L4-5 from the prior MRI, and mild-moderate degenerative changes in the facets were noted at L3-4 through L5-S1, which were also noted to have no significant progression from the prior MRI.

On August 24, 2005, Tilton was evaluated by neurosurgeon Dr. Chad Abernathey. After reviewing her prior MRIs, Dr. Abernathey opined Tilton's neural elements were well decompressed, and he did not recommend surgery "due to a paucity of clinical and radiographic findings." From February 16, 2006, to about March 27, 2006, Tilton's chiropractor provided a note excusing her from work because of low back pain. Her chiropractor noted she was working on spinal strengthening to allow her to return to work.

On August 12, 2007, Tilton had another MRI. This scan also showed a disk protrusion at L4-5. A large focal spur on the right facet joint at L5-S1 was identified as abutting the right S1 nerve root.

On July 8, 2008, Tilton returned to Dr. Gray. She told him that she had been moving boxes after she and her son had lost their homes due to flooding. Dr. Gray noted that Tilton "[did] not remember any specific accident but about a week ago she started getting this left lower back pain," and that she was on disability from work "because she has a fairly heavy job of lifting." On July 14, 2008, Tilton had an MRI which revealed no changes from her August 2007 MRI. On July 31, 2008, she began treatment with Dr. Farid Manshadi. He performed an adjustment of her SI joint, "and after that she did feel a lot better." He recommended electromyography (EMG) testing. That testing came back normal with no evidence of lumbosacral radiculopathy.

On February 4, 2010, Tilton's chiropractor completed a form that asked whether Tilton's condition made her "unable to perform any of [her] job functions," to which he responded, "No." He stated that, barring surgery, her disc bulges and bone spur were permanent and would be a source of flare-ups in the future that could cause her to miss work. He wrote that Tilton was "not currently" incapacitated, "but it is possible/probable over the course of the year," and that Tilton may need to miss work for medical treatment. In his opinion it would be impossible to know how long future flare-ups might last.

On March 22, 2010, Tilton began treating with Dr. Stanley Mathew. He recorded, "The patient has a history of chronic low back pain for the last 3 weeks. She denies any accident, injury, or fall, but says she has been doing a lot of

bending and lifting at work . . . ."  Dr. Mathew also noted, "The patient has a previous history of similar symptoms 2 years ago.  She said physical therapy helped resolve her pain."  On July 7, 2010, Dr. Mathew provided Tilton a note indicating she could return to work "[w]ithout any restriction" on July 12, 2010.  Tilton tried to return to work as planned on July 12 but was unable to do so.  On July 13, Tilton reported to Dr. Mathew that the Voltaren gel and cyclobenzaprine he prescribed seemed to help the pain.  A new MRI showed a "new tiny right posterior disc protrusion at L1-2," a "new mild broad-based left far-lateral disc protrusion at L2-3," a "mild broad-based left lateral and far-lateral disc protrusion at L3-4 and L4-5," and "[u]nchanged right facet arthropathy."

On August 10, 2010, Tilton returned to Dr. Mathew.  He reported that, on that day, she "describe[d] no pain."  Dr. Mathew continued, "She had an epidural steroid injection 2 weeks ago.  She says she has been pain-free for the last 2 weeks and would like to do 2 weeks of physical therapy before returning to work.  Again today she denies any pain in her low back or hips."

On September 1, 2010, Tilton returned to Dr. Mathew.  He reported:

> She is doing very well.  The patient recently received a transforaminal epidural steroid injection, which she says has improved her symptoms.  She feels very good.  She denies minimal pain, 1 [out of] 10.  Denies any pain radiating into her legs, localized to her back, aggravated by activity, better with rest . . . .  [T]he combination [of the gel and medication] has been covering her pain very well.  She is able to walk independently four to five blocks, independent with all activities of daily living.

Dr. Mathew's examination revealed the range of motion in Tilton's lumbar spine was "full and pain-free."  Tilton was released to "work full duty" and "[w]ithout any restriction" effective September 8, 2010.

At an October 6, 2010, appointment, Dr. Mathew noted Tilton had returned to work and was "overall doing well." He wrote that Tilton "[d]oes complain of aches and pains, but is tolerating it." In December, he noted that she was "[o]verall doing much better."

Tilton left Heinz on disability on April 15, 2013, and did not return. She had been working Clean As You Go for over three years at that time. Tilton testified that on April 15, 2013, she reported to work and shortly after "the pain was just so unbearable that I just said I just can't do this no more." Dr. Mathew testified he felt it was appropriate for Tilton to have stopped working on April 15, 2013.

At the time of her 2016 hearing with the Iowa Deputy Iowa Workers' Compensation Commissioner, Tilton was under permanent restrictions established by Dr. Mathew in 2015. She was to "avoid prolonged standing, walking, sitting, repetitive bending, squatting, lifting of more than 15 pounds." Dr. Mathew diagnosed her with "chronic low back pain, sacroiliitis, enthesopathy of hips, [and] DJD L-S radiculopathy," which was permanently aggravated by the cumulative trauma from her work. He also opined that she was not capable of full-time employment based on twenty percent whole-person impairment.

In his testimony, Dr. Mathew stated Tilton's condition is "extremely" painful, and she worked until the "pain got so unbearable." He also testified that continued work would be dangerous to Tilton and would result in "intractable pain," "worsening degeneration of her spine," "risk of further degeneration of her hips, knees, low back," and "possible impingement of nerves."

tDr. Marc Hines concurred, confirming Tilton suffered a cumulative trauma injury related to her work at Heinz. Dr. Hines opined that Tilton's work at Heinz,

and in particular in the Clean As You Go position, had been a substantial contributing factor in causing her low back condition to progress. He also found her to be at fourteen percent whole-person impairment and that she has "multilevel disk disease and facet arthropathy in her lumbar spine . . . motion multilevel facet arthropathy, multilevel lumbar disk disease and multilevel lumbar disk osteophyte complexes, which have also contributed to sacroiliitis and greater trochanteric bursitis." Dr. Hines opined these problems "ha[d] an etiology in work at H.J. Heinz."

Dr. Bradley echoed the opinions of Dr. Mathew and Dr. Hines, stating that "prolonged standing, bending, [and] lifting" have "place[d] increased pressure on the discs and joints of [Tilton's] lumbar spine" and prevent her from seeking full-time, gainful employment. Vocational rehabilitation specialist Barbara Laughlin stated that even sedentary work would be impossible for Tilton, "as she is not able to perform prolonged sitting required in sedentary occupations."

Tilton filed her arbitration petition against Heinz and Liberty in March 2015. The hearing was held in March 2016, and the deputy commissioner issued a decision on July 1, 2016. The deputy commissioner concluded Tilton was aware "by 2011 that her condition was work related, serious, and potentially compensable" and, because "she did not provide notice to her employer until May of 2013 . . . and did not file a petition for benefits until 2015," her claim for benefits was barred by Iowa Code sections 85.23 and 85.26(1) (2015). Tilton appealed the decision. In his appeal decision, the commissioner's designee found her claim for benefits was barred by Iowa Code section 85.23.

In 2018, Tilton petitioned for judicial review of the agency's decision in the district court. The district court concluded the agency applied an incorrect legal

standard; substantial evidence did not support the agency decision; and therefore the decision was irrational, illogical, and wholly unjustifiable. The district court remanded the matter to the agency for further proceedings. Heinz and Liberty appealed that decision, and we affirmed the district court's remand but reversed its independent findings. *See Tilton v. H.J. Heinz Co.* (*Heinz I*), No. 18-1629, 2019 WL 3317393 (Iowa Ct. App. July 24, 2019).

On remand, the deputy commissioner determined Tilton knew or reasonably should have known her back injury would have a permanent adverse impact on her employment on February 4, 2010, and so her claim was time barred by Iowa Code section 85.23. Tilton petitioned for judicial review, and the district court found that the deputy commissioner's discovery rule date determination was irrational, illogical, and wholly unjustifiable, and not supported by substantial evidence. The district court again remanded the matter to the agency for further proceedings. Heinz and Liberty again appealed that decision, and we affirmed the district court's remand to the deputy commissioner. *See Tilton v. H.J. Heinz Co.* (*Heinz II*), No. 21-1777, 2022 WL 2824290 (July 20, 2022).

On remand, the deputy commissioner voluntarily recused himself. The Commissioner issued the remand decision on May 22, 2023, concluding that (1) in relation to the discovery rule, notice and statute of limitations requirements concerning Tilton's work injury were tolled until April 15, 2013; (2) Tilton's health condition was caused, and permanently aggravated, by her April 15, 2013, work injury; (3) Tilton's work for Heinz caused and permanently aggravated, lit-up, or accelerated her lumbar spine condition and chronic pain; (4) Tilton was entitled to permanent total disability benefits from the date of injury of April 15, 2013; and

(5) Tilton was entitled to $20,000 in penalty benefits. Heinz and Liberty petitioned for judicial review and the district court denied that petition and affirmed the Commissioner's findings on January 12, 2024. Heinz and Liberty now appeal to our court.

## II. Standard of Review

The first issue raised by Heinz and Liberty alleges the Commissioner made an error of law. The remaining issues allege the Commissioner made erroneous factual findings. The Iowa Administrative Procedure Act, Iowa Code chapter 17A, governs judicial review of workers' compensation cases. Iowa Code § 10A.322 (2024). If the claim of error lies with the agency's findings of fact, we ask whether substantial evidence supports those findings of fact. *Meyer v. IBP, Inc.,* 710 N.W.2d 213, 219 (Iowa 2006). We are bound by the Commissioner's findings of fact as long as they are supported by substantial evidence in the record taken as a whole. *Id.* at 218.

Substantial evidence is "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). "The question on appeal is not whether the evidence supports a different finding than the finding made by the commissioner, but whether the evidence supports the findings actually made." *Meyer,* 710 N.W.2d at 218 (cleaned up).

If "the claim of error lies with the agency's interpretation of the law, the question on review is whether the agency's interpretation was erroneous, and we

may substitute our interpretation for the agency's." *Id.* at 219. And if "the claim of error lies with the ultimate conclusion reached [by the agency], then the challenge is to the agency's application of the law to the facts . . . ." *Id.* The question on judicial review then becomes "whether the agency abused its discretion by, for example, employing wholly irrational reasoning or ignoring important and relevant evidence." *Id.* "An agency's application of the law to the facts can only be reversed if we determine such an application was 'irrational, illogical, or wholly unjustifiable.'" *Mycogen Seeds v. Sands,* 686 N.W. 2d 457, 465 (Iowa 2004) (quoting Iowa Code § 17A.19(10)(m)). If agency rules and precedent are ignored, or if the agency's decision disregards a relevant and important matter, reversal by the reviewing court is appropriate. Iowa Code § 17A.19(10)(g), (h), (j).

With these principles in mind, we consider the issues before us.

## III. Discussion

Heinz and Liberty argue the Commissioner erred in (1) failing to make explicit findings on Terry Tilton's credibility; (2) determining the discovery rule date to be April 15, 2013; (3) determining Tilton's low back and mental conditions were causally related to and permanently aggravated by her employment with Heinz and caused her to be permanently and totally disabled; and (4) determining Tilton was entitled to penalty benefits.

### A. Tilton's Credibility

Heinz and Liberty allege the Commissioner committed an error of law in not including express findings on Tilton's credibility. In their view, the Commissioner had a duty to explicitly state, "I find Tilton to [be/not be] credible." Heinz and Liberty

cite *McDowell v. Town of Clarksville,* 241 N.W.2d 904 (Iowa 1976), and *Arndt v. City of Le Claire,* 728 N.W.2d 389 (Iowa 2007), to support this argument.

Both cases support the proposition that the Commissioner needed to determine credibility. *See Arndt,* 729 N.W.2d at 394–95 ("It is the commissioner's duty as the trier of fact to *determine* the credibility of the witnesses, weigh the evidence, and decide the facts in issue." (emphasis added)); *McDowell,* 241 N.W.2d at 908 ("[T]he fact finder must not 'arbitrarily or totally reject' testimony; 'he has the duty to weigh it and *determine* its credibility.'" (emphasis added) (citation omitted)). But in its thoughtful and well-reasoned ruling, the district court explained that these cases do not support Heinz and Liberty's argument that the Commissioner was required to explicitly state her credibility findings:

> The Court finds a distinction between the duty to *determine* credibility and a requirement to *write* the credibility findings into the decision. While *Arndt* and *McDowell* expressly emphasize the duty of the commissioner to weigh and determine credibility findings, the Court finds no language or implication in either case which mandates that credibility determinations be stated in the decision as findings. There is also no indication that a lack of written credibility findings constitutes an error of law which necessitates reversal. The Court finds [Heinz and Liberty's] reliance on *McDowell* and *Arndt* misplaced as neither case supports [Heinz and Liberty's] contention. The Commissioner may properly fulfill the duty of determining credibility without including the credibility findings in the written decision.

Heinz and Liberty's sole response to the district court's reasoning is to argue that "[Tilton] was not credible given inconsistencies and fabrications in her testimony at hearing." But that is not an argument relating whether the Commissioner did or was required to make explicit credibility findings—it is an argument relating to how Heinz and Liberty believe the Commissioner should have weighed Tilton's credibility.

And there are examples of the Commissioner taking Tilton at her word by expressing her statements or opinions as it findings, such as Commissioner's statement that "[t]he record supports Tilton's preexisting chronic low back pain became worse over time while she was working for Heinz until she could no longer tolerate the pain." Relatedly, the Commissioner made no statements expressing skepticism or doubt as to any of Tilton's statements or claims.

It is clear that the Commissioner implicitly found Tilton credible and her choice to not write such finding into the remand decision was not in error.

## B. Discovery Rule Date

The date of occurrence for cumulative injuries is the date on which the cumulative injury "manifests" itself. *Oscar Mayer Foods Corp. v. Tasler*, 483 N.W.2d 824, 829 (Iowa 1992). A cumulative injury is manifested when the worker, as a reasonable person, would be plainly aware that (1) she suffers from a condition or injury, and (2) such condition or injury was caused by her employment. *Herrera v. IBP, Inc.,* 633 N.W.2d 284, 288 (Iowa 2001).

Further, the statute of limitations does not begin to run on such injuries until "the employee also knows that the physical condition is serious enough to have a permanent adverse impact on the claimant's employment or employability." *Id.* This is known as the discovery date rule and helps ensure that the clock does not begin running until "the claimant knows or should know the 'nature, seriousness, and probable compensable character' of his injury or condition." *Id.* (citation omitted). "The question of whether a claimant knew, or should have known, of the nature, seriousness, and probable compensability of her injury is a question of fact to be determined by the commissioner." *Midwest Ambulance Serv. v. Ruud*, 754

N.W.2d 860, 865 (Iowa 2008). Whether the claimant should have known the nature of her injury is an objective standard requiring the claimant to exercise the awareness of a reasonable person. *See Herrera*, 633 N.W.2d at 288–89.

Heinz and Liberty contend that the Commissioner erred by finding the discovery date to be April 15, 2013. They claim that the discovery date should have been set in 2011. Heinz and Liberty provide a few flawed arguments in support of that claim.

First, they point out that Tilton agreed that she changed the way she worked at Heinz within a year of the time she started the Clean As You Go position. They argue that "[a]ltering the way she performed her job duties in 2011 demonstrated a specific time where her ability to work was seriously affected by her back condition." While it may be true that altering the way she worked could indicate her back condition was seriously affecting her work, it is not necessarily true that such alterations reflected her back condition would *permanently* affect her work. And Heinz and Liberty provide no evidence that Tilton's 2011 actions indicate awareness of her injury's permanence. We do not agree that accommodating her injury is indicative of an injury's permanence. Indeed, almost any moderate-to-severe injury would require work accommodations for the injured employee. But we can find no case law supporting the assertion that accommodations for injury can serve as the sole basis for a finding of permanence.

Next, Heinz and Liberty insist that 2010 was the year Tilton should have reasonably been aware of the permanent nature of her injuries. Specifically, they point to the exhibit in which her "chiropractor noted that [Tilton] had a permanent condition concerning her low back in [February] 2010."

But we have already—twice—held that Tilton did not know and should not have reasonably known on September 8, 2010, or earlier that her injuries were permanent. *See Heinz I*, 2019 WL 3317393, at *5; *Heinz II*, 2022 WL 2824290, at *3. And we considered—and rejected—this exact argument when Heinz and Liberty made it before us the last time we heard an appeal in this case. *See Heinz II*, 2022 WL 2824290, at *3. Heinz and Liberty provide us with no reason to depart from our previous holding on this same argument. "It is irrational and illogical to find that Tilton's injury had a permanent adverse impact on her employment" in February 2010, which is "seven months prior to the date that this court found Tilton was not suffering from such an injury." *Id.*

Lastly, Heinz and Liberty argue that the discovery rule date should be set, at the latest, to January 23, 2013. They highlight an FMLA certification provided by Dr. Gray which "would require her to attend appointments and work part-time or on a reduced schedule two to three times a month." They contend that this certification evidences the doctor's opinion that her injuries were permanent. But this argument ignores the fact that this doctor's opinion was offered in support of a period of FMLA leave. The medical questions asked in the form are only meant to inform the U.S. Department of Labor whether the employee will be eligible for FMLA protections during the period of requested leave. In fact, the form itself explains that a term "such as 'lifetime' . . . may not be sufficient to determine FMLA coverage." Thus, an FMLA certification form does not necessarily provide persuasive value on whether an injury is permanent beyond the FMLA leave period being sought. And in any event, the information provided by Dr. Gray in this certification cuts against Heinz and Liberty's argument. Dr. Gray provided a

general approximation that the duration of Tilton's injury would be "one year?" Dr. Gray's words there expressly opined that her injury would not be permanent.

Thus, there is insufficient evidence in the record to set the discovery rule date at any date before April 15, 2013. And there is no dispute that Tilton's resignation based on injury had a "permanent adverse impact on [Tilton]'s employment." *Herrera*, 633 N.W.2d at 288. Accordingly, we find substantial evidence supports a discovery rule date of April 15, 2013.

### C. Cause/Aggravation of Injuries and Disability Status

Heinz and Liberty next argue that substantial evidence did not support the Commissioner's determination that Tilton's low back and mental conditions are causally related to and permanently aggravated by her employment with Heinz. To support their insufficient evidence argument, Heinz and Liberty primarily focus establishing that Tilton's complaints relating to her work injuries were not credible. They argue "the opinions of Dr. Mathew, Dr. Bradley and Dr. Hines were solely contingent upon [Tilton]'s subjective complaints, which should not be believed given her lack of credibility." But this is not a *de novo* review, and, as we already confirmed, the Commissioner found Tilton to be credible. Tilton provided extensive evidence of the Clean As You Go position's extreme physical demands. Her safety manager confirmed that "what [Tilton] stated was very representative of what a day would be."

And we are persuaded that the expert testimony of three doctors provided the Commissioner with substantial evidence in support of her determination about the cause and subsequent aggravation of Tilton's conditions. *See Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) ("Medical causation

'is essentially within the domain of expert testimony'" and "the determination of whether to accept or reject an expert opinion is within the 'peculiar province' of the commissioner." (citations omitted)).

Lastly, Heinz and Liberty claim that Tilton's failure to seek other employment indicates that her resignation was voluntary and that her injuries are not permanent and total. We fail to see how that would be damaging to Tilton on whether she is permanently disabled—there would be little reason for her to seek employment if her doctor did, in fact, opine that she is totally disabled. And the Commissioner did not err by deferring to the opinion of three doctors who have recently evaluated Tilton over that of Dr. Abernathey who has not evaluated Tilton since 2005—many years before her injuries became permanent.

We hold that substantial evidence supports the Commissioner's findings relating to the causes, aggravations, and status of Tilton's injuries.

### D. Penalty Benefits

Under Iowa Code section 86.13 (2001), a delay in commencement of benefits without reasonable or probable cause or excuse results in an award of penalty benefits, up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

Heinz and Liberty assert that the 2001 version of section 86.13 does not require them to have conducted a reasonable investigation into Tilton's investigation claim. But the then-effective language did require them to have "reasonable or probable cause or excuse" for delays in commencement or termination of benefits. *Id.* "A reasonable cause or excuse exists if either (1) the delay was necessary for the insurer to investigate the claim or (2) the employer

had a reasonable basis to contest the employee's entitlement to benefits. A 'reasonable basis' for denial of the claim exists if the claim is 'fairly debatable.'" *Christensen v. Snap-On Tools Corp.*, 554 N.W.2d 254, 260 (Iowa 1996). "Whether the issue was fairly debatable turns on whether there was a disputed factual issue that, if resolved in favor of the employer, would have supported the employer's denial of compensability." *Gilbert v. USF Holland, Inc.*, 637 N.W.2d 194, 199 (Iowa 2001).

Heinz and Liberty argue that the previous 2016, 2018, and 2021 Iowa Workers' Compensation Deputy Commissioner decisions provide a reasonable basis for their delay of benefits to Tilton. But Liberty first officially denied Tilton's claim on August 28, 2014. And Liberty falsely told Tilton's counsel on October 17, 2013, that Liberty had "nothing to show an injury at work occurred," and that any such injury had not been reported to Heinz. Yet Tilton formally provided Heinz notice of a work injury in May 2013, and on September 10, 2013, Dr. Mathew provided Liberty with a report stating, "I do believe the patient's current low back, hip pain, DID, sacroiliitis and trochanteric bursitis is a condition due to work-related injury to a reasonable degree of medical certainty." This was a report that the Liberty case manager had expressly requested. Then, after waiting nearly one year, Liberty finally sought the opinion of Dr. Abernathey and stacked the deck when obtaining such opinion. Dr. Abernathey did not evaluate Tilton during that review, had not seen Tilton since 2005, was not provided with Dr. Mathew's report, and was provided with an inaccurate job description for the Clean As You Go position.

Liberty's delay after receiving a medical opinion supporting Tilton's entitlement to benefits, conveyance of false information, and failure to be transparent with Tilton, her counsel, and Dr. Abernathy, collectively provided substantial evidence for the Commissioner's determination that Tilton was entitled to penalty benefits.

## IV.    Conclusion

The Commissioner committed no errors of law, and her factual findings and determinations were supported by substantial evidence.  In the words of the district court, Heinz and Liberty "request [our] court to use its own judgment to replace the Commissioner's credibility findings and the applicable discovery date.  On judicial review, [our] court is concerned with substantial evidence and errors of law." Accordingly, we affirm.

**AFFIRMED.**